IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONAL BRAND LICENSING, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:02-CV-0663-A |
| | § | |
| WILLIAMSON-DICKIE | § | |
| MANUFACTURING COMPANY, A | § | |
| Texas Corporation, and WILLIAMSON- | § | |
| DICKIE MANUFACTURING | § | |
| COMPANY, A Delaware Corporation, | § | |
| | § | |
| Defendants. | § | |

## BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.
## IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Ernest E. Figari, Jr.
State Bar No. 06983000
Dennis M. Lynch
State Bar No. 90001506

FIGARI DAVENPORT & GRAVES, L.L.P.
3400 Bank of America Plaza
901 Main Street
Dallas, Texas 75202
(214) 939-2000
(214) 939-2090 (FAX)

ATTORNEYS FOR PLAINTIFF
NATIONAL BRAND LICENSING, INC.



## **TABLE OF CONTENTS**

I.      SUMMARY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     NATURE OF THE CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    STATEMENT OF UNDISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.      The Exclusive Agency Agreement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        C.      Letter Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        D.      1991 Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        E.      Documentation and Signing of 1991 Amendment  . . . . . . . . . . . . . . . . 7

        F.      Termination of the Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        G.      The Ensuing Four Years  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        H.      Cessation of Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        I.      Demand and Suit  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.     ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.      Under the Terms of the Amended Agreement,
                the "Actively Engaged" Condition Does Not
                Survive Termination  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                1.      Plain Language of the 1991 Amendment . . . . . . . . . . . . . . . . . . 11

                2.      Surrounding Circumstances  . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                3.      Strict Construction Against the Author  . . . . . . . . . . . . . . . . . . 19

                4.      Interpretation Placed on 1991 Amendment by
                        Williamson Before Dispute Arose . . . . . . . . . . . . . . . . . . . . . . . 19

B.    Williamson Is Liable to NBL for (1) Past Due Amounts under the Amended Agreement, (2) Accrued Interest Thereon, and (3) Attorneys' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    1.    Past Due Amounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    2.    Accrued Interest on Past Due Amounts . . . . . . . . . . . . . . . . . . . . . 21

    3.    Attorneys' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.    Since the "Actively Engaged" Condition Does Not Survive Termination of the Amended Agreement, Williamson's Counterclaim Must Be Dismissed . . . . . . . . . . . . . . . . . . . 22

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## <u>TABLE OF AUTHORITIES</u>

### STATE CASES

<u>Page</u>

*Allison v. National Union Fire Insurance Co.,* 734 S.W.2d 645, 646 (Tex. 1987) . . . . . 10

*Anchor Casualty Co. v. Robertson Transport Co.,* 389 S.W.2d 135, 139 (Tex. Civ.
  App.--Corpus Christi 1965, writ ref'd n.r.e.)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Enell Corp. v. Longoria,* 834 S.W.2d 132, 134 (Tex. App.--San Antonio
  1992, writ denied)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19

*Harris v. Rowe,* 593 S.W.2d 303, 306 (Tex. 1979) . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 20

*Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d
  507, 530 (Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Lee v. Lee,* 47 S.W.3d 767, 800 (Tex. App.--Houston [14th Dist.] 2001,
  pet. denied)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Link v. Texas Pharmacal Co.,* 276 S.W.2d 903, 906 (Tex. Civ. App.--
  San Antonio 1955, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Manzo v. Ford,* 731 S.W.2d 673, 676 (Tex. App.--Houston [14th Dist.] 1987,
  no writ)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19

*Northern Natural Gas Co. v. Conoco,* 986 S.W.2d 603, 608 (Tex. 1998)  . . . . . . . . . . . 18

*Portland Gasoline Co. v. Superior Marketing Co.,* 243 S.W.2d 823, 825 (Tex. 1951)  . 18

*Temple-Eastex, Inc. v. Addison Bank,* 672 S.W.2d 793, 798 (Tex. 1984) . . . . . . . . . 11, 19

### STATE STATUTES

Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (Vernon 2002)  . . . . . . . . . . . . . . . . . . . . . 22

Tex. Civ. Prac. & Rem. Code Ann. § 38.002 (Vernon 2002)  . . . . . . . . . . . . . . . . . . . . . 22

N.D. Tex. L.R. 56.5(c) and 56.6(b)(3)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

-iv-

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONAL BRAND LICENSING, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:02-CV-0663-A |
| | § | |
| WILLIAMSON-DICKIE | § | |
| MANUFACTURING COMPANY, A | § | |
| Texas Corporation, and WILLIAMSON- | § | |
| DICKIE MANUFACTURING | § | |
| COMPANY, A Delaware Corporation, | § | |
| | § | |
| Defendants. | § | |

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.
IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff National Brand Licensing, Inc. ("NBL") files this Brief in Support of Motion

for Partial Summary Judgment and, in this regard, would respectfully show the Court as

follows:

## I. SUMMARY

The motion of NBL for partial summary judgment seeks an interpretation of the

written agreement, as amended, between NBL and Williamson-Dickie Manufacturing

Company ("Williamson"). Since the existence of the agreement is undisputed, the

interpretation of such agreement is a question of law. If NBL is correct in its interpretation

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.
IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT -- Page 1**

of the agreement, such interpretation will necessarily result in a dismissal of Williamson's counterclaim, since Williamson's counterclaim is based on the opposite construction of the agreement, as amended.

Further, since the amount of accrued royalties within the scope of the amended agreement is undisputed, NBL seeks a monetary award representing its percentage of such royalties due it under the agreement and interest thereon to date. NBL also seeks a declaration that Williamson is obligated to make future royalty payments to NBL as provided in the agreement.

Finally, if NBL is correct in its interpretation of the amended agreement, NBL seeks an adjudication that Williamson is liable under Chapter 38 of the Texas Civil Practice & Remedies Code for reasonable attorneys' fees in the prosecution of the present action due to Williamson's failure to pay NBL its percentage of royalties under the agreement.[1] Williamson's responsibility for attorneys' fees depends on a presentment of the claim to Williamson and its nonpayment of such claim within thirty days of the presentment.

## II. <u>NATURE OF THE CASE</u>

This is a suit for declaratory relief and breach of contract. NBL filed the current lawsuit (1) to obtain a judicial declaration and construction of a written agreement, as amended, between it and Williamson and (2) in the event NBL's construction of the amended

---

[1] The only matter as to which NBL does not seek summary adjudication by way of the present motion is the <u>amount</u> of reasonable attorneys' fees to be awarded NBL if it prevails in this action.

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.**
**<u>IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT</u> -- Page 2**

agreement is correct, to recover the payments due NBL under such agreement, together with reasonable attorneys' fees, accrued interest, and costs of court. Williamson disputes NBL's construction of the amended agreement and, by way of a counterclaim, asserts the opposite construction of the amended agreement and seeks recovery of certain sums allegedly erroneously paid NBL.

## III. STATEMENT OF UNDISPUTED FACTS[2]

NBL's motion and brief are based on the following facts, all of which are undisputed:

**A.** **Background.** NBL is a New York corporation which was established in 1976 and whose business is soliciting, negotiating, structuring and marketing licenses of intellectual property ("Licensing Business"), such as trademarks and trade names (206-207). NBL has always been a boutique operation and the only two professionals associated with NBL since its inception have been Gene Summ and his wife and business partner, Miriam Summ (207). At all times since the formation of NBL, Gene and Miriam Summ have owned one hundred percent (100%) of the stock in NBL (206-207). NBL was initially located in New York, but as a result of a move in recent years it is currently headquartered in California (206-207).

---

[2] Pursuant to N.D. Tex. L.R. 56.6, NBL has contemporaneously filed its Appendix in Support of the Motion of Plaintiff National Brand Licensing, Inc. for Partial Summary Judgment, which contains the summary judgment evidence relied upon by NBL in its motion and brief. As required under N.D. Tex. L.R. 56.5(c) and 56.6(b)(3), reference throughout is made to the relevant pages of the Appendix where the materials are found (e.g., "1"). Additionally, in accordance with the court's Order dated August 6, 2002, NBL has highlighted those portions of the Appendix that are of particular importance.

Unless otherwise indicated, all emphases are supplied by counsel.

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT -- Page 3**

Williamson is a company whose principal business is the manufacture and sale of wearing apparel for the work place (12). It was originally a Texas corporation but, as a result of a merger in 1998, it became a Delaware corporation bearing the same name (82, 141, 278). It is privately held and is 98% owned by the Williamson family (10-11). Williamson has always had its corporate headquarters in Fort Worth, Texas (248, 279).

**B.    The Exclusive Agency Agreement.** Prior to 1980, Williamson did not license its trademarks and trade names to third parties (60-62, 64). In the middle of 1980, Gene Summ, on behalf of NBL, approached Williamson in an attempt to interest it in a licensing program ("Licensing Program") whereby Williamson, through the assistance of NBL, would offer a license of its trademarks and trade names to third parties (207-208). As a result of this contact, the parties entered into a written agreement on or about July 30, 1980, entitled "National Brand Licensing, Inc. -- Agency Agreement" (the "Agreement") (111-123).[3]

The Agreement provides that during its term, NBL "shall be the sole and exclusive" agent of Williamson for purposes of procuring licensees for Williamson (120). As regards the authority of NBL, the agreement states that "NBL is hereby authorized to offer for license" to third parties those rights of Williamson specified in the Agreement (113). As compensation for its services, the Agreement provides, among other things, that Williamson

---

[3] Since the Agreement and the 1991 Amendment (defined below in paragraph D) are located in several places in the Appendix (e.g., Agreement: 111-123, 214-226, 254-266; 1991 Amendment: 130-134, 233-237, 268-272), in the interest of brevity, quotations from the Agreement and the 1991 Amendment will be cited to those two instruments which are included with the excerpts from the deposition of Philip C. Williamson (i.e., Agreement: 111-123; 1991 Amendment: 130-134).

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT -- Page 4**

will pay NBL a fifteen percent interest in all royalties or proceeds which Williamson may derive from any license procured by NBL ("15% Interest") (116).

C.   **Letter Amendments.** The business relationship between NBL and Williamson proved successful[4] and, as a result, over the next several years, the parties expanded the scope of the products and geographic area to which the Agreement pertained (22-25, 63-64, 208). In this regard, the scope of the Agreement was expanded by a series of six one-page letter amendments during the period from 1982 to 1995 (227-232).[5]

D.   **1991 Amendment.** In the early part of 1991, Stephen Lefler, who at the time was the president and chief executive officer of Williamson and oversaw its Licensing Program, arranged a meeting in New York with Gene Summ, the president of NBL (209, 249).[6] According to Mr. Lefler, he wished to insure that neither NBL nor the Summs would thereafter transfer the 15% Interest provided in the Agreement (249-250). When Mr. Lefler and Mr. Summ met, Mr. Lefler suggested that the Agreement be amended so as to foreclose any future assignment of the 15% Interest (209).

---

[4] The current president of Williamson testified that revenues from licenses procured by NBL had reached approximately $32 million by 1997 (62-63).

[5] The six letter amendments have no relevance to the dispute before the Court and they are described in this Statement of Undisputed Facts in the interest of completeness.

[6] Apart from Mr. Lefler and Mr. Summ, the only other person who attended the New York meeting was Philip C. Williamson, age 29 at the time and a junior officer at Williamson, who was there as an observer and did not participate in the ensuing discussions (5, 27-28, 35, 40-49, 50, 209, 250). At the time, Mr. Williamson had only been with the company for a few years, had no past experience in licensing, and had no involvement with the Licensing Program (30, 34, 209, 250).

After receiving Mr. Lefler's proposal, Mr. Summ discussed the matter with Miriam Summ, his wife and business partner (209). They decided that NBL would agree to the proposal if the exclusivity period under the Agreement (i.e., the period during which neither party could terminate the Agreement for convenience) was extended by five years (209). When this request was subsequently presented to Mr. Lefler, he agreed to it on behalf of Williamson, provided Miriam and Gene Summ remained active in the Licensing Business during the term of the Agreement (209, 250). Mr. Lefler stated that his purpose in imposing this condition was to make sure that, if Williamson granted a five-year extension of the period of exclusivity, the Summs would continue to dedicate themselves to the Licensing Program and not rest on their past successes (250). On behalf of NBL, Mr. Summ agreed to this condition (209, 250).

In agreeing to amend the Agreement in the respects discussed, it was Mr. Lefler's understanding and intent on behalf of Williamson (1) that, should Gene Summ and his wife cease to be "actively engaged" in the Licensing Business during the term of the Agreement, Williamson would no longer be obliged to pay the 15% Interest to NBL, (2) but if either Williamson or NBL elected to terminate the Agreement after the five-year exclusive period for the convenience of either party, the obligation of Williamson to pay the 15% Interest would continue beyond such termination (250-251). Of course, Mr. Summ and Mr. Lefler share the same view as to what this amendment was intended to accomplish (209-210).

E.    **Documentation and Signing of 1991 Amendment.**    After Mr. Lefler and Mr. Summ agreed on the terms of the proposed amendment, Mr. Lefler requested that Williamson's attorneys prepare and draft the document incorporating the agreement (31-33, 50, 210, 251).[7]    After Mr. Summ received the proposed amendment from Williamson's attorneys, it was signed by NBL, Gene Summ and Miriam Summ (134, 210, 251).[8]    The amendment, entitled "Amendment to National Brand Licensing, Inc. Agency Agreement" (the "1991 Amendment"), is dated May 29, 1991 (130-134).

F.    **Termination of the Agreement.**    After Mr. Lefler left Williamson in 1996 and Philip C. Williamson assumed his position, Mr. Williamson unilaterally decided to terminate Williamson's 18 year business relationship with NBL (17).    To this end, Mr. Williamson sent a letter, dated February 26, 1998, to NBL ("Termination Letter"), stating that Williamson was terminating the Agreement for the convenience of Williamson, effective May 31, 1998 (53-54, 135-136, 210).[9]

By letter dated March 9, 1998, and on behalf of NBL, Mr. Summ responded to the Termination Letter (137-140, 240 - 243).    In his response, Mr. Summ expressed his

---

[7]    It is noteworthy that Williamson's attorneys, the Fort Worth law firm of Decker Jones McMackin McClane Hall & Bates (the "Decker law firm" or "Williamson's attorneys"), were not involved in the negotiations and, in drafting the proposed amendment, merely acted on what Mr. Lefler told them (251).

[8]    Neither NBL, Gene Summ nor Miriam Summ had any attorney representing their interests review or advise them with respect to the 1991 Amendment before they signed it (210).

[9]    It is undisputed that Williamson had never in the past experienced any problems with NBL (69).    Indeed, in the Termination Letter, Mr. Williamson extolled the successes of NBL, allowing as how the efforts of NBL had "contributed significantly" to the development of the Licensing Program (135, see 63-64).    The vice president of licensing at Williamson was in agreement with this view (171).

disappointment and pledged NBL's continued cooperation to insure that the Licensing

Program operated smoothly (137-138, 240-241), but observed that:

> I'm sure you are aware that our Agreement provides that your obligation to pay NBL its 15% interest in the proceeds you derive from licenses in place <u>continues</u>.

(138, 241).

G.    **The Ensuing Four Years.**   Consistent with NBL's view of the amended

Agreement that the payment obligation continued, Williamson, for the next approximate four

years, continued paying NBL the 15% Interest due under the amended Agreement (211).

Indeed, over the course of this approximate four year period, the aggregate amount paid NBL

exceeded $880,000 (211). Most significantly, beginning with the Termination Letter and

throughout the approximate four year period which followed, Williamson was counseled in

the matter by the Decker law firm (56, 164, 167), the same firm of attorneys who had

prepared the 1991 Amendment and Termination Letter (31-33, 54-56, 194, 195, 251).

H.    **Cessation of Payments.**   Approximately four years after NBL received the

Termination Letter, NBL received a second letter from Williamson, this one dated January

30, 2002 (83, 211). The second letter ("Stop Payment Letter"), again under signature of Mr.

Williamson, advised NBL that Williamson was discontinuing payment of the 15% Interest

because Gene and Miriam Summ were allegedly no longer active in the Licensing Business (142-144, 244-246).[10]

After reciting a litany of actions NBL allegedly failed to take under the amended Agreement (which Williamson had terminated four years before), the Stop Payment Letter complained that "we have no evidence that you have solicited new licenses for Williamson-Dickie since termination of the Agreement" (143). Of course, the Stop Payment Letter (142-144) fails to explain how NBL could procure new licenses for Williamson when NBL's authority to make such arrangements had been terminated four years earlier, with the Termination Letter (53-54, 134-135). It is noteworthy that the "majority" of the Stop Payment Letter was prepared by the Decker law firm (84) -- Williamson's long-time counsel in this matter.[11]

**I.    Demand and Suit.**  A few weeks after receipt of the Stop Payment Letter, Gene Summ saw Philip Williamson at an apparel convention and requested that Williamson reinstate payment to NBL of the 15% Interest and advised that, if it did not, NBL would be pursuing its legal remedies (212).[12] Since Williamson never reinstated payment of the 15%

---

[10] Even though the Decker law firm assisted in the preparation of the Stop Payment Letter (73), the Stop Payment Letter did not seek return of the some $880,000 paid NBL over the preceding four years (142-144). Of course, in the counterclaim recently fashioned by the Decker law firm, Williamson now seeks recovery of the approximate $880,000 (283-286).

[11] Mr. Williamson sent a copy of the Stop Payment Letter to the attorney at the Decker law firm who prepared the majority of it (84, 144, 195). As previously noted, this is the same law firm that prepared the 1991 Amendment and the Termination Letter and has fashioned Williamson's counterclaim in the present action (194, 286).

[12] Although there appears to be some confusion about the matter, Mr. Williamson testified repeatedly that he had also received a formal, written demand from Mr. Summ (92, 94-96, 99, 102, 106, 108, 145-148). In any event, out of an abundance of caution, counsel for NBL sent a formal demand to counsel for Williamson requesting compliance

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT -- Page 9**

Interest to NBL, Mr. Summ engaged the undersigned law firm to prosecute the present action and agreed, on behalf of NBL, to pay it a reasonable fee for its services herein and on appeal, in the event of an appeal (212).

## IV.  ARGUMENT AND AUTHORITIES

### A.    Under the Terms of the Amended Agreement, the "Actively Engaged" Condition Does Not Survive Termination.

A reading of the 1991 Amendment reveals that the "actively engaged" condition (132) does not survive the termination of the Agreement.  In this regard, there are at least three general rules of contract construction in Texas[13] which militate such a result:

First, the rule is well-settled that the intent of the parties must be determined from the plain language of the contract in light of the surrounding circumstances.  E.g., Allison v. National Union Fire Ins. Co., 734 S.W.2d 645, 646 (Tex. 1987) ("the intent of the parties must be determined from the plain language of the agreements"); Harris v. Rowe, 593 S.W.2d 303, 306 (Tex. 1979) (the construction of a contract should be resolved "in the light of surrounding circumstances" and the "primary object of courts in construing written contracts is to arrive at the intention of the parties").

Second, since Williamson was the draftsman of the 1991 Amendment, the law is well established that its terms must be construed most strictly against Williamson.  E.g., Temple-

---

with the amended Agreement (273-276).  Of course, Williamson has not acceded to any of the demands it has received (212, 274).

[13] The Agreement (before and after the 1991 Amendment) stipulates that the law of Texas is to govern its interpretation (121).

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT -- Page 10**

Eastex, Inc. v. Addison Bank, 672 S.W.2d 793, 798 (Tex. 1984) ("a writing is generally construed most strictly against its author"); Enell Corp. v. Longoria, 834 S.W.2d 132, 134 (Tex. App.--San Antonio 1992, writ denied) ("the contract must be construed most strictly against its author"); Manzo v. Ford, 731 S.W.2d 673, 676 (Tex. App.–Houston [14th Dist.] 1987, no writ) ("a writing is construed most strictly against its author").

Finally, the interpretation placed on a contract by the parties thereto, before the dispute arose, is entitled to great weight. E.g., Harris, 593 S.W.2d at 306 (Tex. 1979) ("[t]he court should adopt the construction of the instrument as placed upon it by the parties [before the dispute arose] unless there is clear language in the instrument indicating an intention to the contrary"); Anchor Casualty Co. v. Robertson Transport Co., 389 S.W.2d 135, 139 (Tex. Civ. App.--Corpus Christi 1965, writ ref'd n.r.e.) ("the courts should adopt the construction of such instrument as placed on it by the parties thereto").

Applying these rules of construction to the 1991 Amendment makes it abundantly clear that the "actively engaged" condition does not survive termination of the Agreement:

### 1. **Plain Language of the 1991 Amendment**.

The plain language of the 1991 Amendment makes it clear that if either party terminates the Agreement the obligation of Williamson to pay NBL the 15% Interest survives such termination. In this regard, section 5.2 of the Agreement (both before and after the 1991 Amendment) provides that Williamson shall pay to NBL "a 15% interest in any and all

proceeds" which Williamson may derive from any license procured by NBL (116).  In the 1991 Amendment, section 5.3 of the Agreement was amended to provide that:

> 5.3 Licensor's [i.e., Williamson's] obligation to make payments to NBL as set out in 5.2 [providing for the 15% Interest] shall cease if either (a) the relevant license and any renewal thereof has terminated according to its terms or (b) both Gene Summ and Miriam Summ have ceased to be 'actively engaged in the business' as that term is hereinafter defined; provided, however, that termination of this Agreement by either party [i.e., termination for convenience under section 8.1] shall not effect Licensor's obligation to make payments as set out in 5.2; and provided, further, that any amendments to a license or sales agreement or the substitution of one agreement for another shall not affect Licensor's obligation to make payments as set out in 5.2.[14]

> * * *

> In the event that Licensor's obligation to make payments to NBL shall cease by operation of the provisions of this paragraph 5.3, then this Agency Agreement will automatically terminate and the Agreement will be of no further force and effect.

(132).  Similarly, section 8.1 of the 1991 Amendment states that:

> . . . In the event of any termination hereunder, all payments provided for under Section 5.2 [providing for the 15% Interest] and 5.3 shall continue to be paid.

(133).

---

[14] Section 5.3 of the 1991 Amendment goes on to provide in its second paragraph a definition of "actively engaged in the business" (132).

### 2. **Surrounding Circumstances**.

When the plain language of the 1991 Amendment is read in light of the surrounding circumstances, the import of the pertinent language becomes even more clear. The persons primarily involved in the circumstances surrounding and leading up to the 1991 Amendment were (1) Mr. Lefler, the president of Williamson at the time, and (2) Mr. Summ, the president of NBL.[15] According to the declaration of Mr. Lefler, who is no longer with Williamson and is therefore a neutral witness:

> 8. In the first part of 1991, I met with Gene Summ in New York and proposed to Mr. Summ that Williamson and NBL amend the Agreement. At this time, I was the president and chief executive officer with full authority to negotiate on behalf of Williamson. In this regard, I suggested that the Agreement be amended to foreclose any future assignment of the 15% Interest. Although the business relationship between Williamson and NBL had been entirely satisfactory, my purpose in proposing an amendment to the Agreement was to insure that neither NBL nor the Summs transferred the 15% Interest provided in the Agreement.

> 9. I was the sole officer of Williamson who negotiated with Gene Summ with respect to the proposed amendment. Indeed, apart from the initial meetings in New York (which Phillip Williamson,[16] another employee of Williamson, attended as an observer), no other representative of Williamson was involved in the negotiation of the proposed amendment.

---

[15] Philip C. Williamson was an observer at the initial meeting in New York leading up to the negotiation of the 1991 Amendment (250); however, he had limited involvement at the meeting and recalls very little about the discussions that took place except as to generalities regarding the request for nonassignability of the 15% Interest (42, 45, 48-49, 65-66, 67).

[16] The footnote that appears at this point in the quoted text has been omitted.

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT -- Page 13**

10.     After I proposed during the first meeting that the Agreement be amended to foreclose the assignability of the 15% Interest, Gene Summ responded by suggesting that the initial term of exclusivity under the Agreement be extended by five (5) years.

11.     After giving Mr. Summ's proposal consideration, I had further contact with him and agreed to the requested extension, provided the Summs remained active in the licensing business and continued to solicit new licenses for Williamson. <u>My purpose in imposing this condition was to make sure that, if Williamson went along with a five-year extension of the period of exclusivity, the Summs would continue to dedicate themselves to the Licensing Program and not rest on their past successes.</u> Mr. Summ agreed to this condition.

(249-250).   This was also the understanding of Mr. Summ as to the surrounding circumstances (209-210).

Thus, the concepts that emanated from the negotiations leading to the 1991 Amendment were three-fold: (1) the nonassignability of the 15% Interest,[17] (2) an extension by five years of the period of NBL's exclusivity,[18] and (3) a reciprocal assurance by NBL in favor of Williamson that, if the period of exclusivity was extended, the Summs would remain

---

[17] The concept of nonassignability of the 15% Interest was embodied in section 10 of the 1991 Amendment (133). It provides:

10.  None of the rights given to NBL or to Gene Summ or Miriam Summ by the terms of this Agreement may be assigned in whole or in part without the express written agreement of Licensor [i.e., Williamson] and any such agreement by Licensor [i.e., Williamson] shall be within its sole discretion.

[18] The extension of the exclusivity period was embodied in section 8.1 of the 1991 Amendment (133). It provides:

8.1  Effective June 1, 1991, a new initial term shall be established and the new initial term shall be for a period of five (5) years commencing on June 1, 1991 and expiring on May 31, 1996. . . .

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT -- Page 14**

"actively engaged" in the business (209-210, 250-251). While under the 1991 Amendment the obligation to pay the 15% Interest ceases if the Summs do not remain "actively engaged" in the business and, in turn, the Agreement will "automatically terminate" (132), the reverse is not true because, if termination of the Agreement precedes inactivity on the part of the Summs (i.e., a termination under section 8.1 of the 1991 Amendment), the 1991 Amendment stipulates that payment of the 15% Interest "shall continue to be paid" (133).[19] Stated otherwise, if the Agreement is terminated for the convenience of one of the parties, as it was here, the obligation of Williamson to pay the 15% Interest continues.[20]

Williamson's tortured construction of the 1991 Amendment would take the matter to an illogical extreme: if the "actively engaged" condition is triggered by inactivity on the part of the Summs, according to the last paragraph of section 5.3 of the 1991 Amendment, the obligation of Williamson to pay the 15% Interest ceases and the Agreement automatically terminates (132). However, if the Agreement has already been terminated (as was the case here) and the Summs thereafter ceased to be "actively engaged," the Agreement would not be terminated for a second time.

Further, the construction of the 1991 Amendment advanced by Williamson is unreasonable and would work a forfeiture. Specifically, Williamson claims that the Summs

---

[19] This concept was embodied in section 5.3 of the 1991 Amendment as quoted previously.

[20] Of course, if the Summs ceased to be "actively engaged" in the business before the Agreement is terminated, the price NBL pays for the extended period of exclusivity would be a forfeiture of payment of the 15% Interest, followed by an automatic termination of the Agreement (132).

have not been "actively engaged in the business"[21] and, as a result, Williamson has the ability to forfeit NBL's 15% Interest.

What Williamson chooses to overlook in arriving at its strained construction, however, is that the primary requirement of the definition of "actively engaged in the business," requires the Summs, on behalf of NBL, to be:

> . . . actively and regularly soliciting new licensees for Licensor [i.e., Williamson]

(132). Of course, given the fact that Williamson terminated the amended Agreement in 1998, NBL was <u>no longer authorized to solicit new licensees for Williamson</u>, as that authority had been revoked.[22] Hence, after Williamson terminated the Agreement in 1998, NBL was no longer authorized to solicit licenses for Williamson and, by definition, it was impossible to satisfy the "actively engaged" condition in the 1991 Amendment.

---

[21] The term "actively engaged in the business" is defined in the 1991 Amendment as follows:

> The term 'actively engaged in the business' as that term is used in this paragraph 5.3 shall mean that either Gene Summ or Miriam Summ [1] <u>is actively and regularly soliciting new licensees for Licensor</u> [i.e., Williamson] and [2] is actively and regularly contacting existing licensees to promote licensed product sales of Licensor [i.e., Williamson] and [3] is maintaining an office and office staff sufficient to support license activities on behalf of Licensor [i.e., Williamson] and [4] is available to attend Licensor's quarterly license review meeting at Licensor's [i.e., Williamson's] cost if such attendance is requested and [5] is in attendance at Licensor's [i.e., Williamson's] annual sales meeting at his or her own cost and [6] provided that either Gene Summ or Miriam Summ is spending not less than twenty (20) hours per week conducting licensing activities; provided that such activities need not be for the sole benefit of Licensor [i.e., Williamson]

(132).

[22] Under the amended Agreement, before it was terminated, NBL was "<u>authorized</u> to offer [the trademarks and trade names of Williamson] for license" (113) and, in this connection, Williamson "<u>authorize[d]</u> NBL to approach parties . . . to ascertain the potential interest of such parties in acquiring [such] a license (113)."

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** -- Page 16

Turning full circle, Williamson has met itself coming back the other way.  In this regard, Mr. Williamson confirmed the obvious, admitting that:

> Q.   Is it correct that from your review of PX-1 [i.e., the Agreement] you cannot find any language that suggests NBL has an obligation after termination of the agreement to either solicit new licenses for Williamson-Dickie or to promote product sales by existent licenses, true?
>
> * * *
>
> Q.   Is your answer "yes" to my question, then?
>
> A.   <u>To the best of my knowledge</u>.
>
> Q.   To the best of your knowledge, yes?
>
> A.   <u>Yes</u>

(91).  Similarly, speaking on behalf of Williamson (169), the vice president of licensing, Dennis C. Bowie[23] testified:

> Q.   So you are saying in the 1991 agreement, PX-2 [i.e., 1991 Amendment], you believe from your reading of it there is an obligation on the part of NBL after the agreement, PX-1 [i.e., Agreement] is terminated that NBL has an ongoing obligation to solicit licensees for Williamson-Dickie, true?
>
> A.   <u>I don't think he has an obligation</u>

---

[23] It should be noted that Mr. Bowie was designated to testify on behalf of Williamson pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure (157-158, 169, 179-184).

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.**
<u>**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**</u> **-- Page 17**

(177). Of course, if NBL had no obligation after termination to solicit licensees for Williamson (in addition to having no authority to do so), how could the "actively engaged" condition have survived such termination? Relevant here is the rule that:

> 'It is not to be presumed that the parties intended that an impossible thing should be done, or that the parties deliberately entered into an agreement calling for an impossible condition or event as a test of performance.' [Citation omitted]. <u>A construction which renders performance of the contract possible will be adopted, rather than one which renders its performance impossible</u> or meaningless, unless the latter construction is absolutely necessary. . . .[Citation omitted].

<u>Portland Gasoline Co. v. Superior Marketing Co.</u>, 243 S.W.2d 823, 825 (Tex. 1951), <u>overruled on other grounds</u>, <u>Northern Natural Gas Co. v. Conoco</u>, 986 S.W.2d 603, 608 (Tex. 1998). Additionally, by adopting its twisted construction of the 1991 Amendment, Williamson is seeking a forfeiture of NBL's 15% Interest. Controlling here is the rule that:

> Forfeitures are not favored by our laws. 'If the terms of a contract are fairly susceptible of an interpretation which will prevent a forfeiture, they will be so construed.' [Citation omitted]. 'The courts will not declare a forfeiture, unless they are compelled to do so, by language which will admit of but one construction, and that construction is such as compels a forfeiture.' [Citation omitted].

<u>Link v. Texas Pharmacal Co.</u>, 276 S.W.2d 903, 906 (Tex. Civ. App.--San Antonio 1955, no writ).

### 3. Strict Construction Against the Author.

Further, it is undisputed that Williamson, through its attorneys, authored the 1991 Amendment (31-33, 50, 210, 251). Thus, under controlling law, the 1991 Amendment must be "strictly construed" against Williamson. E.g., Temple-Eastex, Inc., 672 S.W.2d at 798; Enell Corp., 834 S.W.2d at 134; Manzo, 731 S.W.2d at 676.

### 4. Interpretation Placed on 1991 Amendment by Williamson Before Dispute Arose.

A further and final indictment of Williamson's strained construction of the 1991 Amendment is the very interpretation that Williamson (and NBL) placed on such agreement before the present dispute arose. In this regard, it is undisputed that, for the approximate four years following its termination of the Agreement, Williamson continued to pay NBL its 15% Interest, even though it now claims that the Summs were not "actively engaged" in the business at the time (74).[24] In this regard, Philip C. Williamson, the current president of Williamson, testified:

> Q. Is it correct that you terminated the agreement effective May 31, 1998?
>
> A. Yes.
>
> Q. Is it correct that Williamson-Dickie continued to make payments under the original agreement to NBL to at least January 30, 2002 [i.e., for approximately four years]?

---

[24] The actions of Williamson in this regard take on even more importance when account is taken of the fact that over $880,000 was paid to NBL during this approximate four year period (211).

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT -- Page 19**

A.    <u>Yes</u>.

(86).

* * *

Q.    So what I am hearing you say is, the agreement, PX-1, was terminated on -- effective May 31, 1998, but payments due NBL under that agreement continued until at least January 30, 2002, correct?

A.    <u>Yes</u>.

(87-88).  In view of these admissions, the following holding in <u>Harris</u>, 593 S.W.2d at 306 is most pertinent:

> No principle of interpretation of contracts is more firmly established than that great, if not controlling, weight should be given by the court to the interpretation placed upon the contract of uncertain meaning by the parties themselves.  Courts rightfully assume that parties to a contract are in the best position to know what was intended by the language employed. [Citation omitted].  <u>The court should adopt the construction of the instrument as placed upon it by the parties unless there is clear language in the instrument indicating an intention to the contrary</u>.

Of course, the actions of Williamson in this regard assume additional importance when considered in light of the fact that, when Williamson continued paying NBL its 15% Interest after termination of the amended Agreement, Williamson had access to and was presumably being guided by its attorneys in such matter (56, 164, 167, 194, 195).

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT -- Page 20**

**B. Williamson Is Liable to NBL for (1) Past Due Amounts under the Amended Agreement, (2) Accrued Interest Thereon, and (3) Attorneys' Fees.**

### 1. Past Due Amounts and Future Obligations.

According to Dennis C. Bowie, Williamson's vice president of licensing and its designated representative, the net amount due NBL under the amended Agreement, through June 30, 2002 (which was the most current information Williamson had at the time of the depositions in this case), aggregates $73,012.09 (174-176, 186). Thus, if NBL's interpretation of the amended Agreement is correct, the Court should award NBL the sum of $73,012.09 for past due amounts owed it through June 30, 2002. Further, the Court should declare that, as provided under the amended Agreement, the payment of the 15% Interest to NBL continues into the future for as long as licensees secured by NBL for Williamson remain in place.

### 2. Accrued Interest on Past Due Amounts.

The law is well-settled in Texas that, in this situation, NBL is entitled to recover 10% interest on all past due amounts owed to NBL under the amended Agreement. E.g, Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 530 (Tex. 1998); Lee v. Lee, 47 S.W.3d 767, 800 (Tex. App.--Houston [14th Dist.] 2001, pet. denied).

### 3. Attorneys' Fees.

NBL is further entitled under Chapter 38 of the Texas Civil Practice & Remedies Code to recover its reasonable attorneys' fees herein and on appeal in the event of an appeal.

See Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (Vernon 2002). It is undisputed that NBL

has satisfied the requisites of presentment (212, 273-276; see also 92, 94-96, 99, 102, 106,

108, 145-148) and nonperformance by Williamson (212, 274). See Tex. Civ. Prac. & Rem.

Code Ann. § 38.002 (Vernon 2002).

## C. Since the "Actively Engaged" Condition Does Not Survive Termination of the Amended Agreement, Williamson's Counterclaim Must Be Dismissed.

To the exact opposite of NBL's position, Williamson's counterclaim assumes that the

"actively engaged" condition in the 1991 Amendment survives the termination of the

Agreement. Since NBL has demonstrated hereinabove that this is not the case, Williamson's

counterclaim must be dismissed.

## V. CONCLUSION

NBL requests that its motion for partial summary judgment be granted in all respects.

Specifically, by way of partial summary judgment, NBL requests that:

1. the Court declare, under the terms of the 1991 Amendment, that the "actively engaged" condition does not survive termination of the Agreement;

2. the Court award NBL a monetary recovery against Williamson of $73,012.09, representing the 15% Interest due NBL under the amended Agreement through June 30, 2002, together with interest thereon at the rate of 10% per annum from the date originally due through the entry of a final judgment herein;

3. the Court declare that the payment of the 15% Interest continues in the future for as long as those licensees secured by NBL for Williamson remain in place;

4. the Court adjudge Williamson liable to NBL for reasonable attorneys' fees for the prosecution of the present action before this Court and on appeal (in the

event of an appeal), the amount of which fees to be determined through later proceedings in this matter;[25]

5.      the Court dismiss with prejudice the counterclaim of Williamson asserted herein; and

6.      all costs of court be taxed against Williamson.

---

[25] If NBL's motion for partial summary judgment is granted, the only issue remaining in the case is the amount of a reasonable attorneys' fee for the prosecution of the present action before this Court and on appeal, in the event of an appeal. At that point, depending on the desires of the Court, NBL is agreeable to having a hearing on the matter or following the procedures authorized by Rule 54(d) of the Federal Rules of Civil Procedure.

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** -- Page 23

Respectfully submitted,

By: _____
Ernest E. Figari, Jr.
State Bar No. 06983000
Dennis M. Lynch
State Bar No. 90001506

FIGARI DAVENPORT & GRAVES, L.L.P.
3400 Bank of America Plaza
901 Main Street
Dallas, Texas 75202
(214) 939-2000
(214) 939-2090 (FAX)

ATTORNEYS FOR PLAINTIFF
NATIONAL BRAND LICENSING, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been sent

via hand delivery to counsel for Defendant, Daniel L. Bates, Decker, Jones, McMackin,

McClane, Hall & Bates, P.C., 801 Cherry Street, Suite 1200, Fort Worth, Texas 76102-6836,

on this the _13th_ day of January, 2003.

_____
Dennis M. Lynch

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT -- Page 24**