

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

NATIONAL BRAND LICENSING,
INC.,

       Plaintiff,

vs.

WILLIAMSON-DICKIE
MANUFACTURING COMPANY, a
Texas corporation, and
WILLIAMSON-DICKIE
MANUFACTURING COMPANY, a
Delaware corporation,

       Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

CIVIL ACTION NO. 4:02-CV-0663-A


**DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

## Table of Contents

I. SUMMARY OF ARGUMENT ......................................................................................1

II. ISSUE IS WHETHER PAYMENTS CEASE IF BOTH GENE AND MIRIAM SUMM CEASE ACTIVE ENGAGEMENT IN THE BUSINESS ....................................................3

III. INTENT OF PARTIES EXPRESSED IN WRITTEN AMENDMENT ...........................4

IV. REVIEW OF THE ORIGINAL AGREEMENT.............................................................5

V. COMPARISON AND ANALYSIS OF 1991 AMENDMENT.........................................8

CLAUSE ONE –PAYMENTS FOR LIFE OF LICENSES. ..............................................9

CLAUSE TWO- TERMINATION DOES NOT AFFECT DURATION...............................9

CLAUSE THREE- LICENSE AMENDMENTS DO NOT AFFECT DURATION.............10

1991 AMENDMENT ADDS CONDITION ON PAYMENT DURATION.........................11

VI. ANALYSIS OF NBL'S CONSTRUCTION................................................................12

A. NBL'S CONSTRUCTION IS GRAMMATICALLY FLAWED ..................................13

B. THE LANGUAGE OF THE TERMINATION CLAUSE DOES NOT AFFECT CONDITION FOR ACTIVE ENGAGEMENT ................................................................14

C. NBL'S CONSTRUCTION IS INCONSISTENT WITH THE WHOLE AGREEMENT ......................................................................................................................................15

D. NBL'S CONSTRUCTION IS ILLOGICAL..............................................................16

VII. AMENDED SECTION 5.3 AUTHORIZES NBL TO SOLICIT LICENSES.............17

VIII. CONSTRUCTION OF CONTRACT AGAINST DICKIES UNWARANTED...........19

IX. POST-TERMINATION PAYMENTS CONSISTENT WITH ....................................20

X. DECLARATION OF R. STEPHEN LEFLER INCONSISTENT ...............................22

PRAYER....................................................................................................................24

# Table of Authorities

## Cases

*GTE Mobilnet of South Texas Ltd. Partnership v. Telecell Cellular, Inc.*, 955 S.W.2d 286 (Tex. App.- Houston [1st Dist.] 1997, pet denied) ........................................................20

*Kincaid v. Gulf Oil Corp.*, 675 S.W.2d 250 (Tex. App.- San Antonio 1994, writ ref'd n.r.e.)....................................................................................................................20

*Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857 (Tex. 2000), *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417 (Tex. 2000), and *Heritage Resources, Inc. v. Nationsbank*, 939 S.W.2d 118 (Tex. 1996). ...............................................................5

*Nat'l. Union Fire Ins. V. CBI Industries*, 907 S.W.2d 517 (Tex. 1995) .............................4

*T Corp v. Rylander*, 2 S.W.3d 546 (Tex. App.-Austin 1999, pet denied) .......................20

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONAL BRAND LICENSING, INC., | § § § § § | |
| Plaintiff, | § § | |
| vs. | § § | CIVIL ACTION NO. 4:02-CV-0663-A |
| WILLIAMSON-DICKIE MANUFACTURING COMPANY, a Texas corporation, and WILLIAMSON-DICKIE MANUFACTURING COMPANY, a Delaware corporation, | § § § § § § § § | |
| Defendants. | § | |

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

Now Comes Williamson-Dickie Manufacturing Company, Inc., hereinafter referred to as "Dickies" or "WD," to file its brief in opposition to the motion for partial summary judgment filed by National Brand Licensing, Inc., "NBL," and would respectfully provide arguments and authorities to the court as follows:

### I.
### SUMMARY OF ARGUMENT

The 1991 amendment to the agency agreement is clear; in plain language, and unambiguous. Whether the parties intended that termination of the agency agreement through non-renewal eliminated the requirement that either Gene or Miriam Summ be "actively engaged in the business" should be determined from the written terms of the amendment in light of the whole agreement. Neither current claimed recollection of the

negotiations nor claims of intent extraneous to the written contract have any place in the court's consideration.

The 1991 amendment continued the distinction made in the original agreement between the concepts of how long NBL gets paid and how long the exclusive agency lasts. The termination by non-renewal of the agency agreement has no effect on whether or for how long NBL gets paid 15% of the revenues Dickies receives from licenses. Payments to NBL cease if either the licenses expire or both Gene and Miriam Summ ceases to be "actively engaged in the business." The agency agreement is terminated by non-renewal or if payments cease.

NBL's contention that non-renewal of the agency agreement eliminates the provision that payments cease if both Gene and Miriam Summ cease to be "actively engaged in the business" is an incorrect rendering of the language of the amendment. NBL's construction is grammatically incorrect, is inconsistent with the agreement as a whole, and is illogical.

NBL's contention that it is precluded from soliciting licenses because termination of the agency agreement revokes its authority is flawed. No express authority is required for NBL to solicit licenses. If some authority is necessary the amendment provides, at least by implication, authority to NBL to continue new license solicitation beyond termination of the agency agreement.

NBL claims this contract must be construed against its author and, thus, the court should adopt the construction it advances. However, because the contract is not ambiguous no such construction against the author is warranted. Further, because NBL's construction is patently incorrect, the construction against the author precept is

inapplicable.  Unreasonable and illogical constructions are never imposed on the author of a contract.

NBL claims the fact that WD continued to pay NBL for a period of time after the agreement was not renewed is conduct which evidences that Dickies understanding of the agreement is inconsistent with its current position.  NBL concludes Dickies continued to pay NBL because WD recognized that termination of the agency agreement eliminated the condition that the Summs continue to be "actively engaged in the business." Review and analysis of the summary judgment proof and NBL's argument reveals that there is nothing about the conduct of Dickies that is inconsistent with either the plain language of the agreement or WD's position in this case.

## II.
## ISSUE IS WHETHER PAYMENTS CEASE IF BOTH GENE AND MIRIAM SUMM CEASE ACTIVE ENGAGEMENT IN THE BUSINESS

The main issue in this case is whether, after the agreement terminated by non-renewal, payments to NBL cease if both of the Summs have "ceased to be actively engaged in the business" as that phrase is defined in Section 5.3 of the 1991 amendment.  NBL contends that termination of its exclusive agency by non-renewal eliminates the requirement that either Gene or Miriam Summ be actively "engaged in the business." NBL reads the amended Section 5.3 as limiting the duration of the provision that payments cease if both Gene and Miriam Summ cease to be "actively engaged in the business" to the five-year initial term of the amended agreement, or while the agency agreement was thereafter in effect.  NBL also concludes, however, that WD's obligation to pay 15% of royalties received on NBL-generated licenses continues despite termination of the agency agreement so long as licenses continue to

generate royalties. Thus, as NBL attempts to construe Section 5.3 as amended, non-renewal of the agreement while not affecting the provision that payments cease if licenses expire does affect, by elimination, the provision that payments cease if both Gene and Miriam Summ cease to be "actively engaged in the business."

Dickies would show that the plain reading of the 1991 amendment, along with the exclusive agency agreement as a whole, clearly expresses the intent of the parties. WD shows that objective analysis of the original agreement along with the 1991 amendment reveals that termination of the agency agreement is not an event that affects either of the provisions establishing the duration of its obligation to pay NBL. Payments cease when the licenses expire or when both Gene and Miriam Summ have ceased to be "actively engaged in the business," regardless of whether the agency agreement has terminated.

### III.
### INTENT OF PARTIES EXPRESSED IN WRITTEN AMENDMENT

In support of its motion, NBL attempts to introduce and rely upon evidence extrinsic to the written amendment to prove its claimed intent. However, per WD's objections, this evidence violates the parol evidence rule or is otherwise incompetent. Evidence of a contracting party's intent extrinsic to the contract as written is not admissible to create an ambiguity, vary terms, or to explain intent unless the court first finds the contract is ambiguous. *Nat. Union Fire Ins. V. CBI Industries*, 907 S.W.2d 517 (Tex. 1995). Absent ambiguity the court must ascertain and give effect to the parties' intentions as expressed in the writing. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857 (Tex. 2000), *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417 (Tex. 2000), and *Heritage Resources, Inc. v. Nationsbank*, 939 S.W.2d 118 (Tex. 1996).

Therefore what Gene Summ, or anyone, now contends was intended in 1991 is inadmissible and should not be considered by the court in construing the contract.

NBL does not urge the court to carefully review the original exclusive agency agreement, to then compare the changes made in the 1991 amendment, and to construe Section 5.3 in light of the agreement as a whole.  Rather, NBL simply seeks to have this court consider parol evidence in determining whether termination of the exclusive agency eliminates the provision that payments cease when both Gene and Miriam Summ cease to be "actively engaged in the business."  This case does not present the type of fact pattern in which the surrounding circumstances should be considered.  The court should look solely to the written agreement along with the 1991 amendment to determine the intent of the parties rather than to consider that which individuals now claim to recall about their intent in 1991.   When the court carefully reviews the original agreement, compares the 1991 amendment and analyzes the agreement in its entirety, it becomes clear that WD's construction of the agreement is correct.

## IV.
## REVIEW OF THE ORIGINAL AGREEMENT

The first step, of course, is to review the pertinent portions of the original agreement.  Originally the duration of WD's obligation to pay NBL a percentage of royalties was limited only by the life of the licenses. Section V of the original agreement provided for how much NBL got paid and established how long NBL got paid.  The original Section V also answered the question of whether termination of the agency agreement affected how much or how long NBL got paid. Finally, the original Section V

addressed whether amendments to or substitution of licenses affected how much or how long NBL got paid.

Section 5.2 established the right of NBL to receive 15% of the royalties received by WD. Although Section 5.2 established the payment, **nothing** in Section 5.2 established how long such payments were to be made. Section 5.2 is silent on the duration of the income stream due NBL. Thus, for purposes of analysis, Section 5.2 is hereinafter referred to as the "how much?" section of the agreement.

The duration of WD's obligation to pay NBL was established in Section 5.3. For ease in analysis, Section 5.3 is hereinafter referred to as the "how long?" section of the agreement.

Section 5.3 of the original agreement provided in pertinent part as follows:

> "All payments due NBL shall be payable during the life of each relevant license or renewals thereof, regardless of whether or not this Agreement has been terminated by either party." (Appendix Supporting NBL's Motion for Partial Summary Judgment pg. 116.)

From this provision, the original duration of WD's payments obligation was equal to the life of the licenses.

It is important to note that the original Section 5.3 also addressed the issue of whether "how long" NBL gets paid was affected by termination of the agency agreement. Clearly the answer was no. "[R]egardless of whether or not this Agreement has been terminated by either party…" means termination of the agency agreement is not an event that affects the duration of the payments. The clause in Section 5.3 providing for payment for the life of the licenses necessarily survived termination of the agency agreement.

Continuing review of pertinent portions of the original agreement, Section VIII (Appendix in Support of NBL's Motion for Partial Summary Judgment pg. 118-119) governed the term and duration of the agency agreement  (distinguished from how much and how long NBL gets paid).  After an initial term of one year, the agreement was automatically renewed for additional one-year terms unless either party gave notice of election to terminate the agreement at least ninety (90) days prior to the expiration of the current term pursuant to Section 8.1.  In the event of termination, Section 8.1 provided that "all payments due NBL as set forth in Section 5.2 ("how much?") and 5.3 ("how long?") shall be continued to be paid as provided in therein" (Appendix in Support of NBL's Motion for Partial Summary Judgment pg. 119; parenthetical portions ours).

Because termination does not affect how long NBL got paid, the original agreement separated and distinguished the duration of the agency agreement from the duration of the payment obligation. It is clear that originally termination of the agency agreement was not an event that affected how much or how long NBL got paid.  Taken together, 5.3 and 8.1 of the original agreement obligated WD to pay NBL 15% of the royalties it received for the life of the licenses regardless of whether the agency agreement was terminated. The duration of the agency agreement is not equal with the duration of the obligation to pay NBL.

For analysis and comparison of the original agreement with the 1991 amendment, the key idea to be taken from the original agreement is that termination of the agency agreement is an event that has absolutely no effect on how much or for how long NBL was entitled to be paid.

Another relevant provision of the original agreement includes Section 10.5 (Appendix in Support of NBL's Motion for Partial Summary Judgment pg. 122) prohibited amendment or modification of its terms except in writing signed by both Dickies and NBL.

**V.**
**COMPARISON AND ANALYSIS OF 1991 AMENDMENT**

Comparison of the 1991 amendments with the original agreement first reveals that the "how much?" section was not amended. Section 5.2 of the original agreement was not changed in any way. The first provision amended was the "how long?" section, Section 5.3. Close and careful comparison of the original Section 5.3 with the amended Section 5.3 reveals the duration of payments due NBL was additionally conditioned. The original 5.3 provided:

> "All payments due NBL shall be payable during the life of each relevant license or renewals thereof, regardless of whether or not this Agreement has been terminated by either party." (Appendix Supporting NBL's Motion for Partial Summary Judgment pg. 116.)

As amended, new Section 5.3 provides:

> "Licensor's obligation to make payments to NBL as set out in 5.2 shall cease if either (a) the relevant license and any renewal thereof has terminated according to its terms or (b) both Gene Summ and Miriam Summ have ceased to be "actively engaged in the business" as that term is hereinafter defined; provided, however, that termination of this Agreement by either party shall not affect Licensor's obligation to make payments as set out in 5.2; and provided, further, that any amendments to a license or sales agreement or the substitution of one agreement for another shall not affect Licensor's obligation to make payments as set out in 5.2...." (Appendix in Support of NBL's Motion for Partial Summary Judgment pg. 132.)

Comparing the original and amended sections 5.3 reveals there are three clauses in both which are substantially the same.

CLAUSE ONE –PAYMENTS FOR LIFE OF LICENSES.

The first clause provides for payments for the life of licenses.  Comparing the original:

> "All payments due NBL shall be payable during the life of each relevant license or renewals thereof."

with the amended,

> "[p]ayments to NBL as set out in 5.2 shall cease if … (a) the relevant license and any renewal thereof has terminated according to its terms,,,"

reveals no substantive difference.  Duration of payment is still equal to the life of the licenses.  Originally this idea was expressed in positive terms (shall be payable).  The amendment, because it was adding another condition to the duration of payments, merely employed negative terms (shall cease if) to express the same idea.

The other difference is the amendment referenced Section 5.2 not found in the original.  Because 5.2 is the section which established NBL's right to payment and "how much?",  it is obvious that the reference to Section 5.2 in the amendment merely more precisely describes the payment obligation and identifies the location of its genesis.  It is obvious that referencing 5.2 has no substantive effect on the idea that duration of payments remained for the life of the licenses.  Conclude then that the reference to 5.2 does not affect the duration of the payment.  It is the payment prescribed in 5.2 that ceases when the licenses expire.  This is logical because "how much?" (5.2) does not speak to "how long?" (5.3).

CLAUSE TWO- TERMINATION DOES NOT AFFECT DURATION

Comparing the original with the amended Section 5.3 concerning termination of the agreement also reveals no substantive difference.

> ",,, regardless of whether or not this Agreement has been terminated by either party" ;

compared with

> " … provided, however, that termination of this Agreement by either party
> shall not affect Licensor's obligation to make payments as set out in 5.2";

mean the same thing and have the same effect.   That termination of the agency

agreement is not an event that affects how long NBL is entitled to receive payments is

the idea expressed in both clauses.   For ease in analysis, this clause will be referred to

as the "termination clause" in Section 5.3

As with the first clauses, the amendment refers to Section 5.2 which is not found

in the original.   Again as with the first clause, the reference to Section 5.2 merely more

precisely describes the payment obligation and identifies the location of its genesis.

Conclude again that the reference to 5.2 does not affect the duration of the payment.

CLAUSE THREE- LICENSE AMENDMENTS DO NOT AFFECT DURATION

Finally, comparison of the clauses that address whether amendments to or

substitution of licenses affect how long NBL gets paid reveals no difference.

> "Amendments to a license or sales agreement, or the substitution of
> one agreement for another, shall not affect NBL's rights as herein
> established."

compared with

> "[p]rovided, further that any amendments to a license or sales
> agreement or the substitution of one agreement for another shall not effect
> Licensor's obligation to make payments as set out in 5.2"

mean the same thing.   The idea that the duration of the payment obligation is not

affected by the amendment or substitutions of licenses remains the same.   Again, and

consistent with the other two clauses, the reference to 5.2 merely more precisely

described the payment obligation and identifies the location of its genesis.   However,

just as the reference to 5.2 in the other two clauses has no substantive affect on duration of payments, the reference to 5.2 here has no affect on the idea that amending or substituting licenses does not stop payments to NBL.

From our analysis of the plain language of both the original and the amended sections 5.3, we conclude that the same three ideas on duration of the payment obligation originally expressed were retained:

Idea 1)  NBL gets paid as long as licenses are in effect;

Idea 2) Termination of the agency agreement is not an event that affects whether or for how long NBL gets paid; and

Idea 3)  Amendment of licenses does not affect how long NBL gets paid.

The separation of the event of the termination of the agency agreement from the duration of payments found in the original agreement is retained in the amendment.

1991 AMENDMENT ADDS CONDITION ON PAYMENT DURATION

Finally, comparing the plain language of the amendment with the original reveals that one new idea constituting an additional condition on the duration of payment was added in 1991.

Idea 4)  Payments to NBL also cease when both Gene and Miriam Summ cease to be actively engaged in the business.

The new idea (4) is an additional condition on the duration of the payment obligation requiring that either Gene of Miriam Summ be "actively engaged in the business."

As amended, 5.3 provides that NBL gets paid pursuant to the right and in the amount established in Section 5.2 for as long as licenses are in effect and either Gene

or Miriam Summ remains actively engaged in the business.  If the licenses expire, payments to NBL stop.  If and when both Gene and Miriam Summ stop being "actively engaged in the business," as that concept is specifically defined in the amendment, the payments stop. Neither termination of the agency agreement nor substitution of licenses affects whether or for how long NBL gets paid.

## VI.
## ANALYSIS OF NBL'S CONSTRUCTION

In spite of the plain language that termination of the agreement has **no** effect on payments, NBL's contention is that "the 'actively engaged' condition does not survive the termination of the agreement" (Brief of Plaintiff National Brand Licensing, Inc. in Support of Motion for Partial Summary Judgment pg. 10).   The language in the 1991 amendment upon which NBL relies in concluding that the "actively engaged" condition does not survive termination of the agreement, is the "termination" clause in Section 5.3. As stated on page 12 of its brief, NBL emphasizes this language as follows:

"<u>provided, however, that termination of this Agreement by either party</u> [i.e., termination for convenience under section 8.1] <u>shall not effect (sic) Licensor's obligation to make payments as set out in 5.2</u>" (Brief of Plaintiff National Brand Licensing, Inc. in Support of Motion for Summary Judgment pg.12)

Note that NBL did not make any comparison of this language with either the original Section 5.3, or with all of the language of 5.3 as amended, to arrive at the plain meaning of the language in question.  NBL does not make any considered analysis concerning the language of the termination clause.  Rather NBL seizes upon this language and misconstrues it to mean that termination of the agreement somehow eliminates the condition that payments cease if both of Summs cease to be "actively engaged in the business."  NBL then concludes that payments continue because

licenses have not terminated and the termination of the agreement does not affect WD's obligation to pay.

Because the termination clause does not state that termination of the agreement eliminates the condition that the Summs continue "active engagement," NBL in essence would rewrite the termination clause of the new Section 5.3. NBL's construction necessarily renders the termination clause as having no effect on the first clause in 5.3 providing that payment continue for the life of the licenses, but then effecting by eliminating the condition that the Summs continue "active engagement" in the licensing business. NBL surely wants payments to continue for life of the leases, but seeks to have the condition that both Gene and Miriam Summ continue to be "actively engaged in the business" removed. The fallacy in the NBL's construction is readily exposed through all four lines of analysis.

A.    NBL'S CONSTRUCTION IS GRAMMATICALLY FLAWED

NBL's construction of the amended 5.3 is grammatically inconsistent and incorrect. Grammatically, the amended Section 5.3 consists of four clauses contained in one long sentence. (1)- The (a) clause (that payments cease when the licenses expire) and (2)- the (b) clause (that payments cease when both Summs cease "active engagement") are contained in the same sentence. Continuing in the same sentence is clause (3)- the "termination clause" (that termination of the agreement shall not affect the payment obligation). This same sentence concludes with (4)- a "license amendment," clause (concerning license amendment or substitution).

Grammatically, the "provided, however," termination clause and the "provided, further," license amendment clause, must apply equally to all preceding clauses

contained in the same sentence. Conclude then, as a matter of grammar, the proper construction is that termination of the agreement does not affect either the ideas expressed in the (a) or (b) clauses. There is no grammatically correct way to have the idea that "termination does not affect" leave the (a) clause alone but then act to eliminate the idea in clause (b).

For NBL's construction to even have a chance, grammatically, requires a different sentence structure. Place the 5.3 (a) clause (payments cease when licenses expire) in a separate sentence without any "provided, however," termination clause. In a second and separate sentence state 5.3(b) (ceases when both Summs cease "active engagement") followed by the "provided, however," termination clause. Then NBL may grammatically have a point to argue that the "provided, however," termination clause language applies to 5.3 (b) but not 5.3 (a). Had this occurred, the debate over whether the "provided, however," termination clause eliminates the "active engagement" requirement would be legitimately joined, least grammatically. The fact that both clauses 5.3 (a) and (b) are in the same sentence, however, clearly establishes that grammatically there is no basis for applying the "provided, however," to 5.3 (b) and not to 5.3 (a). NBL's construction gets an "F" in grammar.

B.  THE LANGUAGE OF THE TERMINATION CLAUSE DOES NOT AFFECT CONDITION FOR ACTIVE ENGAGEMENT

The second line of analysis is that even if, grammatically, the language of the termination clause in Section 5.3 may apply to the condition of "active engagement" but not to the clause that payment continues until licenses expire, the question becomes whether the language itself affects the condition. The plain language of the termination clause states that termination of the agreement has no effect on the payment obligation.

No effect simply means just that – no effect.  If "A" acts to eliminate "B," it certainly cannot be said that "A" has had no effect on "B".  Rather, "A" had a profound effect on "B" by eliminating "B."

The termination clause does not state that termination of the agreement eliminates or renders void any condition, term, or provision for the duration of payments. The termination clause does not state that it eliminates the condition that payments cease if both Summs have "ceased to be actively engaged in the business."  The termination clause by its plain language simply means that termination of the agreement is not an event that has any effect on whether or for how long NBL gets paid.

C.   NBL'S CONSTRUCTION IS INCONSISTENT WITH THE WHOLE AGREEMENT

The third line of analysis is that NBL's construction is inconsistent with the agreement as a whole as judged by the sections of the agreement concerning duration and termination.  Sections 5.2, 5.3 and 8.1 of the agreement must all be read together. Together these provisions speak to how much NBL gets paid; how long NBL gets paid; how long the exclusive agency is in effect and whether termination of the agency affects how much or for how long NBL gets paid.   Section 8.1 (Appendix in Support of the Motion of National Brand Licensing, Inc. for Partial Summary Judgment pg. 133) provides for the duration of the agency agreement (as opposed to the duration of payments, if any, due NBL).  In pertinent part Section 8.1 provides:

"In the event of any termination hereunder, all payments provided for under section 5.2 and 5.3 shall continue to be paid." (Appendix in Support of the Motion of National Brand Licensing, Inc. for Partial Summary Judgment pg 133)

Section 8.1 provides for termination of the agreement on only one basis: because either party desired that it not be renewed.  Accordingly, "termination hereunder" clearly

refers to termination by non-renewal as provided for in 8.1.  The language in 8.1 is clear that in the event of termination of the agreement by non-renewal, payments shall continue.   No doubt termination of the agreement by non-renewal does not affect payments.  However, nothing in the language in Section 8.1 provides how much post-termination payments should be or how long they should continue.  Accordingly, Section 8.1 plainly refers to Section 5.2 (the how much section) and 5.3 (the how long section) to govern how much the post-termination payments should be and how long such payments should continue.  Sections 5.2 and 5.3 determine how much and how long NBL gets paid after termination by non-renewal.

From the above it is clear that Section 8.1 is consistent in separating the concept of duration of the agency agreement from the concept of duration of payments.  WD's construction of the "termination clause" in 5.3 is consistent in maintaining this distinction.  Contrarily, NBL's attempt to read 8.1 as requiring payments regardless of the condition that both Summs remain "actively engaged" is obviously inconsistent with the common idea running throughout the agreement—that termination of the agency does not affect how much or how long NBL gets paid.

D.     NBL'S CONSTRUCTION IS ILLOGICAL

The fourth line of analysis reveals NBL's construction is illogical.  In our matrix for analysis on this point we refer to "A" as the 5.3 (a) clause that payments cease when licenses expire.  "B" is the 5.3 (b) clause that payments cease if both Summs cease to be "actively engaged in the business."  "C" is the "termination clause" that "provided, however, termination of the agreement shall not affect Licensor's obligation for payments as set out in 5.2."  Since termination did not affect payments, "C" does not

affect "A" or "B." Obviously if "C" eliminates "A" or "B," "C" has had a profound effect on "A" or "B" rather than no effect.

If "C" is to have no effect on "A" or "B" it is illogical for "C" to have no effect on "A" but then to affect "B" by eliminating "B." This is exactly how NBL attempts to render the language of the "termination clause" of Section 5.3. Accordingly, NBL's "C" is supposed to leave "A" alone but eliminate "B." NBL's position, then, is nonsense.

Review of the language of the "termination clause" above readily reveals there is no logical or reasonable way to construe the clause stating that termination is to have no effect so that the "A" limitation on the duration of payments is left unaffected but the "(b)" duration limitation is eliminated. Obviously, if the parties intended that termination of the agency agreement eliminated that the condition of "active engagement," any number simple statements to that effect could have been made. For, example stating that payments to NBL cease if during the term of the agreement both Gene and Miriam Summ cease to be actively engaged in the business, is one way of expressing the intent to eliminate that condition. However, this is not what the amendment stated. No such language is found. There is nothing in the 1991 amendment which links the concepts of the duration of the agreement with the duration of payments. Payment duration and the term of the agreement remain separate and distinct. NBL's construction defies logic.

## VII.
## AMENDED SECTION 5.3 AUTHORIZES NBL TO SOLICIT LICENSES
## ON A NONEXCLUSIVE BASIS

NBL seeks to excuse its admitted failure to "actively and regularly solicit new licensees" for Dickies by claiming that termination of the agency agreement terminated its authority to do so. Section 3.1 of the original agreement provided as follows:

"Licensor authorizes NBL to approach parties in the relevant geographic area, other than parties which Licensor may specifically exclude in written notice to NBL and to ascertain the potential interest of such parties in acquiring a license from Licensor for the Rights. (Appendix in Support of the Motion of National Brand Licensing, Inc. for Partial Summary Judgment pg 113-14)"

This section was, of course, not amended. NBL observes that termination of the agency agreement results in Section 3.1 being inoperative to grant it authority to solicit licenses. Needing an excuse for its lack of performance, NBL leaps to the conclusion that it is not authorized to solicit licenses for Dickies. NBL even goes further, in fact, to contend it is actually prohibited from soliciting new licensees for Dickies. NBL's attempt to avoid the consequences of its failure to actively and regularly solicit licenses for Dickies through the excuse of lack of authority is misplaced.

First, NBL's premise is that some specific authority to solicit licenses is required. NBL cites no legal requirement that it have any specific authority in order to simply contact prospective licensees and communicate with them to determine whether any interest exists to attempt to agree on a license. Even under the terms of the original agency agreement, NBL had no authority to commit Dickies to any prospective license and WD had to approve and execute any and all licenses negotiated. WD is unaware of any legal or ethical prohibition preventing NBL from communicating with prospective licensees to solicit licenses. As NBL has cited no statute, code or case containing any legal prohibition, it appears that NBL's premise that some specific authority is required is hopelessly flawed.

Second, just as there is no legal requirement for special or actual authority, NBL has not cited any legal requirement that it must be vested with express as opposed to implied authority to be able to solicit licenses. Section 5.3 as amended defines being

"actively engaged in the business," *inter alia*, to require NBL to actively and regularly solicit new licensees. Without question, by requiring that NBL actively and regularly solicit licenses, Dickies has by implication authorized NBL to comply with the requirement. Accordingly, NBL has implied authority to actively and regularly solicit licenses. Therefore NBL cannot then use lack of authority as an excuse for failing to have actively and regularly solicited licenses.

## VIII.
## CONSTRUCTION OF CONTRACT AGAINST DICKIES UNWARANTED

NBL claims this contract must be construed against its author, and thus the court should adopt the construction it advances. However, because the contract is not ambiguous no such construction against the author is warranted. The general rule that writings are construed against the author only applies after the document is found to be ambiguous. *AT&T Corp v. Rylander*, 2 S.W.3d 546 (Tex. App.-Austin 1999, pet denied), *GTE Mobilnet of South Texas Ltd. Partnership v. Telecell Cellular, Inc.*, 955 S.W.2d 286 (Tex. App.- Houston [1st Dist.] 1997, pet denied), and *Kincaid v. Gulf Oil Corp.*, 675 S.W.2d 250 (Tex. App.- San Antonio 1994, writ ref'd n.r.e.) There is no claim that the agency agreement is ambiguous. Therefore, the court should not seek to construe the agreement against WD because it was the author.

Further, because NBL's construction is patently incorrect, the construction against the author precept is inapplicable. Unreasonable and illogical constructions are never imposed on the author of a contract.

---

## IX.
## POST-TERMINATION PAYMENTS CONSISTENT WITH
## UNDERSTANDING OF THE AGREEMENT

NBL claims the fact that WD continued to pay NBL for a period of time after the agreement was not renewed is conduct that evidences Dickies understanding of the agreement which is inconsistent with its current position on how the language should be construed. NBL concludes Dickies continued to pay NBL because WD recognized that termination of the agency agreement eliminated the condition that the Summs continue to be "actively engaged in the business". Review and analysis of the summary judgment proof and NBL's argument reveals that there is nothing about the conduct of Dickies inconsistent with either the plain language of the agreement or WD's position in this case. In fact WD's conduct is consistent with its understanding of the contract and its contentions in this case.

It is undisputed that the 1998 termination of the agreement was discretionary through non-renewal of its term. The letter from WD to NBL (Plaintiff's Exhibit 3 Appendix in Support of Motion of National Brand Licensing, Inc. for Partial Summary Judgment pg. 135-36) plainly stated that WD believed it was in its best interest to manage its future licensing efforts internally. Accordingly, NBL was given notice of WD's intent to terminate the agreement at the end of the current term. This is precisely the notice required in Section 8.1 of the agreement as amended. (Appendix in Support of Motion of National Brand Licensing, Inc. for Partial Summary Judgment pg. 133). Nowhere in the letter serving notice of the intent not to renew did Dickies claim both Gene and Miriam Summ had "ceased to be actively engaged in the business."

It is undisputed that WD did not claim both Gene and Miriam Summ "ceased to be actively engaged in the business" until January 30, 2002 (Plaintiff's Exhibit 6 Appendix in Support of Motion of National Brand Licensing, Inc. for Partial Summary Judgment pg. 142-44). Because WD understood that termination does not affect how much or for how long NBL gets paid, Dickies naturally continued payments to NBL after the agreement terminated by non-renewal. Therefore paying NBL after termination of the agency but before claiming Gene and Miriam Summ cannot raise a valid inference that WD understood that termination of the agreement eliminated the condition that Summs continue "active engagement".

Had Dickies terminated the agreement contending that both Gene and Miriam Summ had "ceased to be actively engaged in the business" and then consistently paid NBL over a four-year period, perhaps an inference as to the inconsistency of its positions could be drawn. However, WD stopped payments only after giving NBL notice that it had concluded that both Summs had "ceased to be actively engaged in the business".

From review of the summary judgment proof above it is clear that NBL is simply mistaken in its conclusion that continuing payments after termination evidences that WD understood that the condition of "active engagement" had been eliminated. Dickies continued to make payments after the agreement terminated by non-renewal evidencing that WD understood that termination of the agreement does not affect how much or how long NBL gets paid. Further, the fact that cessation of payments to NBL was preceded by notice that Dickies concluded that both Summs had "ceased to be actively engaged" evidences that WD understood that termination of the agreement did not affect how long

NBL gets paid.  WD's conduct is fully consistent with the understanding it has always had of the plain language of the amendment, that termination of the agreement has no effect on the condition that either Gene or Miriam Summ must continue "active engagement in order for payments to continue.

**X.**

**DECLARATION OF R. STEPHEN LEFLER INCONSISTENT
WITH PRIOR STATEMENT**

Williamson-Dickies continues to contend that evidence of the intent of the parties should be determined solely by the contract as written and amended.  However, in the unlikely event that WD is in error in its analysis and the court is inclined to consider extrinsic evidence, Dickies would show that a memo prepared at the direction of R. Stephen Lefler on May 14, 1991 from Lefler's handwritten notes (WD'S APPENDIX Tab 2, p.5) clearly expresses WD's intent.  The written expression of intent in the Lefler memo is clear and consistent with the terms of the 1991 amendment as actually executed by the parties.

Lefler's memo states in pertinent part:

> "Gene and Miriam Summ will be entitled to remuneration for License management services as long as they are active in the business Brand Licensing business." ( WD'S APPENDIX  Tab 2, p. 5.)

Lefler's memo plainly states the same idea expressed in the 1991 amendment, that payments to NBL are conditioned on Summs' continued "active engagement". Obviously the Lefler memo provided the ideas behind the 1991 amendment despite NBL's protestations that Decker Jones law firm was the author. The "authorship" of the 1991 amendment closely follows the Lefler memo and it is clear that the drafting of the

1991 amendment executed on May 29, 1991 gives effect to the ideas expressed in the Lefler memo of May 14, 1991.

Nothing in the Lefler memo expresses any intent that "active in the Brand Licensing business" be eliminated by termination of the agency agreement. Clearly had Lefler wanted to limit the "active engagement" requirement to the duration of the agency agreement he would have so stated in the memo and the 1991 amendment would have given effect to that idea. The only reasonable conclusion which can be drawn is that in 1991 Lefler intended to pay NBL only as long as the Summs remained "actively engaged".

Now that Lefler is an ex-president of WD, his current recollection of his 1991 intent as claimed in his 2003 declaration (Appendix to NBL's Motion for Partial Summary Judgment Tab E pgs. 247-272) is quite inconsistent with his 1991 memo. Lefler claims his intent in 1991 was that the "actively engaged" requirement would not survive the termination of the agency agreement. Lefler also purports to recall a quasi-legal analysis in 1991 concerning whether after termination of the agreement, NBL would be "authorized" to solicit new licensees, concluding that NBL would not be so authorized. Again nothing in Lefler's written memo states these ideas. No doubt the 1991 memo is the most authoritative evidence of Lefler's intent in 1991.

The Lefler memo together with the declarations of Lefler and Summ provide a good example of why the parole evidence rule exists. As time passes, positions and loyalty change, and recollections change, intent as expressed in evidence extrinsic to the written contract is simply not as reliable as expressed in the written agreement. Thus WD wants the record clear that it does not consider this a casein which parole

evidence of any kind should be considered. WD submitted this evidence for consideration only in the event the court disagrees as considers evidence extraneous to the 1991 written contract. If such evidence is considered, however, it is obvious that a fact issue is raised concerning the intent which precludes the partial summary judgment NBL seeks.

**PRAYER**

WHEREFORE PREMISES CONSIDERED, William-Dickie Manufacturing Company prays that upon consideration hereof the court will deny the Motion for Partial Summary Judgment of National Brand Licensing, Inc. Dickies further prays for general and such other relief at law in equity to which it may show itself justly entitled.

Respectfully submitted,

Daniel L. Bates
State Bar No. 01899900

Decker, Jones, McMackin, McClane,
  Hall & Bates, P.C.
Burnett Plaza, Suite 2000
801 Cherry Street, Unit #46
Fort Worth, Texas 76102-6836
(817) 336-2400
(817) 332-3043 fax
ATTORNEY FOR DEFENDANT

## Certificate of Service

I HEREBY CERTIFY that this instrument was provided to:

Ernest F. Figari, Esq.
Dennis M. Lynch, Esq.
Figari Davenport & Graves
901 Main St., Suite 3400
Dallas, TX 75202

in accordance with the Federal Rules of Civil Procedure, on this 3rd day of

_____, 2003.

Daniel L. Bates