IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONAL BRAND LICENSING, INC., | § § § § | |
| Plaintiff, | § § | |
| vs. | § § | CIVIL ACTION NO. 4:02-CV-0663-A |
| WILLIAMSON-DICKIE MANUFACTURING COMPANY, a Texas corporation, and WILLIAMSON-DICKIE MANUFACTURING COMPANY, a Delaware corporation, | § § § § § § § § | |
| Defendants. | | |

**WILLIAMSON-DICKIE MANUFACTURING COMPANY, INC.'S**
**BRIEF SUPPORTING ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.  SUMMARY OF ARGUMENT................................................................... 1

II. ISSUE IS WHETHER PAYMENTS CEASE IF BOTH
    GENE AND MIRIAM SUMM CEASE ACTIVE ENGAGE-
    MENT IN THE BUSINESS.....................................................................3

III. INTENT OF PARTIES EXPRESSED IN WRITTEN AMENDMENT..............4

IV. THE 1991 AMENDMENT........................................................................5

    CLAUSE ONE – PAYMENTS FOR LIFE OF LICENSES...............................5

    CLAUSE TWO – TERMINATION DOES NOT AFFECT DURATION...............6

    CLAUSE THREE – LICENSE AMENDMENTS TO NOT AFFECT DURATION....7

    1991 AMENDMENT ADDS CONDITION ON PAYMENT DURATION................8

V.  NBL'S FAILURE TO CONTINUE NEW LICENSE SOLICITATION
    WITHOUT EXCUSE ...............................................................................9

VI. AMENDED SECTION 5.3 AUTHORIZES NBL TO
    SOLICIT LICENSES ON A NONEXCLUSIVE BASIS...............................10

VII. POST-TERMINATION PAYMENTS CONSISTENT WITH
     UNDERSTANDING OF THE AGREEMENT...........................................11

VIII. DECLARATION OF R. STEPHEN LEFLER INCONSISTENT
      WITH PRIOR STATEMENT................................................................12

    PRAYER...............................................................................................16

<200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b><200b>

## **TABLE OF CASES AND AUTHORITIES**

1. *Nat'l. Union Fire Ins. V. CBI Industries,*
   907 S.W.2d 517 (Tex. 1995)……………………………………………………………..4

2. *Lopez v. Munoz, Hockema & Reed, L.L.P.*
   22 S.W.3d 857 (Tex. 2000)…………………………………………………………….4

3. *Gulf Ins. Co. v. Burns Motors, Inc.*
   22 S.W.3d 417 (Tex. 2000)…………………………………………………………….4

4. *Heritage Resources, Inc. v. Nationsbank*
   939 S.W.2d 118 (Tex. 1996)……………………………………………………………..4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONAL BRAND LICENSING, INC., | § § § § | |
| Plaintiff, | § § | |
| vs. | § § | CIVIL ACTION NO. 4:02-CV-0663-A |
| WILLIAMSON-DICKIE MANUFACTURING COMPANY, a Texas corporation, and WILLIAMSON-DICKIE MANUFACTURING COMPANY, a Delaware corporation, | § § § § § § § § | |
| Defendants. | | |

## WD'S BRIEF SUPPORTING ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

Now Comes Williamson-Dickie Manufacturing Company, Inc., hereinafter referred to as "Dickies" or "WD," to file its brief in support of its the motion for partial summary judgment and would respectfully provide arguments and authorities to the court as follows:

### I.
### SUMMARY OF ARGUMENT

The 1991 amendment to the agency agreement is clear; in plain language, and unambiguous. Whether the parties intended that termination of the agency agreement through non-renewal eliminated the requirement that either Gene or Miriam Summ be "actively engaged in the business" should be determined from the written terms of the amendment in light of the whole agreement. Neither current claimed recollection of the

negotiations nor claims of intent extraneous to the written contract have any place in the court's consideration.

The 1991 amendment continued the distinction made in the original agreement between the concepts of how long NBL gets paid and how long the exclusive agency lasts. The termination by non-renewal of the agency agreement has no effect on whether or for how long NBL gets paid 15% of the revenues Dickies receives from licenses. Payments to NBL cease if either the licenses expire or both Gene and Miriam Summ cease to be "actively engaged in the business." The agency agreement is terminated by non-renewal or if payments cease.

The summary judgment proof conclusively establishes that after termination of the agreement by non-renewal NBL was still required to be "actively engaged in the business" as that term was defined in section 5.3 of the 1991 amendment to the agreement. (WD'S APPENDIX pg. 27). It is undisputed that being "actively engaged in the business," *inter alia* required either Gene or Miriam Summ to "actively and regularly solicit new licenses for WD. (WD'S APPENDIX pg. 27). It is also undisputed that after termination of the agreement neither Gene Summ nor Miriam Summ actively and regularly solicited new licenses for Dickies. (WD'S APPENDIX pg. 1-2, 59-61).

NBL's contention that non-renewal of the agency agreement eliminates the provision that payments cease if both Gene and Miriam Summ cease to be "actively engaged in the business" is an incorrect rendering of the language of the amendment. NBL's construction is grammatically incorrect, is inconsistent with the agreement as a whole, and is illogical. NBL has no valid excuse for the fact that both Gene Summ and Miriam Summ have "ceased to be actively engaged in the business".

## II.
## ISSUE IS WHETHER PAYMENTS CEASE IF BOTH GENE AND MIRIAM SUMM CEASE ACTIVE ENGAGEMENT IN THE BUSINESS

The main issue in this case is whether, after the agreement terminated by non-renewal, payments to NBL cease if both of the Summs have "ceased to be actively engaged in the business" as that phrase is defined in Section 5.3 of the 1991 amendment. NBL contends that termination of its exclusive agency by non-renewal eliminates the requirement that either Gene or Miriam Summ be actively "engaged in the business." NBL reads the amended Section 5.3 as limiting the duration of the provision that payments cease if both Gene and Miriam Summ cease to be "actively engaged in the business" to the five-year initial term of the amended agreement, or while the agency agreement was thereafter in effect. NBL also concludes, however, that WD's obligation to pay 15% of royalties received on NBL-generated licenses continues despite termination of the agency agreement so long as licenses continue to generate royalties. Thus, as NBL attempts to construe Section 5.3 as amended, non-renewal of the agreement while not affecting the provision that payments cease if licenses expire does affect, by elimination, the provision that payments cease if both Gene and Miriam Summ cease to be "actively engaged in the business."

Dickies would show that the plain reading of the 1991 amendment, along with the exclusive agency agreement as a whole, clearly expresses the intent of the parties. WD shows that objective analysis of the original agreement along with the 1991 amendment reveals that termination of the agency agreement is not an event that affects either of the provisions establishing the duration of its obligation to pay NBL. Payments cease

when the licenses expire or when both Gene and Miriam Summ have ceased to be "actively engaged in the business," regardless of whether the agency agreement has terminated.

### III.
### INTENT OF PARTIES EXPRESSED IN WRITTEN AMENDMENT

In support of its motion, NBL attempts to introduce and rely upon evidence extrinsic to the written amendment to prove its claimed intent. However, per WD's objections, this evidence violates the parol evidence rule or is otherwise incompetent. Evidence of a contracting party's intent extrinsic to the contract as written is not admissible to create an ambiguity, vary terms, or to explain intent unless the court first finds the contract is ambiguous. *Nat'l. Union Fire Ins. V. CBI Industries*, 907 S.W.2d 517 (Tex. 1995). Absent ambiguity the court must ascertain and give effect to the parties' intentions as expressed in the writing. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857 (Tex. 2000), *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417 (Tex. 2000), and *Heritage Resources, Inc. v. Nationsbank*, 939 S.W.2d 118 (Tex. 1996). Therefore what Gene Summ, or anyone, now contends was intended in 1991 is inadmissible and should not be considered by the court in construing the contract.

### IV.
### THE 1991 AMENDMENT

Comparison of the 1991 amendments with the original agreement reveals that the concept of the "how much?" and for "how long?" payments are to be made is distinct from how long the agency agreement lasts. Termination of the agency agreement is not an event which has any affect on how much or for how long NBL gets paid.

Section 5.2 of the original agreement governing how much NBL gets paid was not changed in any way. The first provision amended was the "how long?" section, Section 5.3. Close and careful comparison of the original Section 5.3 with the amended Section 5.3 reveals the duration of payments due NBL was additionally conditioned. The original 5.3 provided:

> "All payments due NBL shall be payable during the life of each relevant license or renewals thereof, regardless of whether or not this Agreement has been terminated by either party." (Appendix Supporting NBL's Motion for Partial Summary Judgment pg. 116.)

As amended, new Section 5.3 provides:

> "Licensor's obligation to make payments to NBL as set out in 5.2 shall cease if either (a) the relevant license and any renewal thereof has terminated according to its terms or (b) both Gene Summ and Miriam Summ have ceased to be "actively engaged in the business" as that term is hereinafter defined; provided, however, that termination of this Agreement by either party shall not affect Licensor's obligation to make payments as set out in 5.2; and provided, further, that any amendments to a license or sales agreement or the substitution of one agreement for another shall not affect Licensor's obligation to make payments as set out in 5.2...." (Appendix in Support of NBL's Motion for Partial Summary Judgment pg. 132.)

Comparing the original and amended sections 5.3 reveals there are three clauses in both which are substantially the same.

CLAUSE ONE –PAYMENTS FOR LIFE OF LICENSES.

The first clause provides for payments for the life of licenses. Comparing the original:

> "All payments due NBL shall be payable during the life of each relevant license or renewals thereof."

with the amended,

> "[p]ayments to NBL as set out in 5.2 shall cease if ... (a) the relevant license and any renewal thereof has terminated according to its terms,,,"

reveals no substantive difference. Duration of payment is still equal to the life of the licenses. Originally this idea was expressed in positive terms (shall be payable). The amendment, because it was adding another condition to the duration of payments, merely employed negative terms (shall cease if) to express the same idea.

The other difference is the amendment referenced Section 5.2 not found in the original. Because 5.2 is the section which established NBL's right to payment and "how much?", it is obvious that the reference to Section 5.2 in the amendment merely more precisely describes the payment obligation and identifies the location of its genesis. It is obvious that referencing 5.2 has no substantive effect on the idea that duration of payments remained for the life of the licenses. Conclude then that the reference to 5.2 does not affect the duration of the payment. It is the payment prescribed in 5.2 that ceases when the licenses expire. This is logical because "how much?" (5.2) does not speak to "how long?" (5.3).

## CLAUSE TWO- TERMINATION DOES NOT AFFECT DURATION

Comparing the original with the amended Section 5.3 concerning termination of the agreement also reveals no substantive difference.

> "... regardless of whether or not this Agreement has been terminated by either party" ;

compared with

> " ... provided, however, that termination of this Agreement by either party shall not affect Licensor's obligation to make payments as set out in 5.2";

mean the same thing and have the same effect. That termination of the agency agreement is not an event that affects how long NBL is entitled to receive payments is

the idea expressed in both clauses. For ease in analysis, this clause will be referred to as the "termination clause" in Section 5.3

As with the first clauses, the amendment refers to Section 5.2 which is not found in the original. Again as with the first clause, the reference to Section 5.2 merely more precisely describes the payment obligation and identifies the location of its genesis. Conclude again that the reference to 5.2 does not affect the duration of the payment.

CLAUSE THREE- LICENSE AMENDMENTS DO NOT AFFECT DURATION

Finally, comparison of the clauses that address whether amendments to or substitution of licenses affect how long NBL gets paid reveals no difference.

> "Amendments to a license or sales agreement, or the substitution of one agreement for another, shall not affect NBL's rights as herein established."

compared with

> "[p]rovided, further that any amendments to a license or sales agreement or the substitution of one agreement for another shall not effect Licensor's obligation to make payments as set out in 5.2"

mean the same thing. The idea that the duration of the payment obligation is not affected by the amendment or substitutions of licenses remains the same. Again, and consistent with the other two clauses, the reference to 5.2 merely more precisely described the payment obligation and identifies the location of its genesis. However, just as the reference to 5.2 in the other two clauses has no substantive affect on duration of payments, the reference to 5.2 here has no affect on the idea that amending or substituting licenses does not stop payments to NBL.

WD'S BRIEF SUPPORTING ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT
Page 7
3590.08114/212150

From our analysis of the plain language of both the original and the amended sections 5.3, we conclude that the same three ideas on duration of the payment obligation originally expressed were retained:

Idea 1) NBL gets paid as long as licenses are in effect;

Idea 2) Termination of the agency agreement is not an event that affects whether or for how long NBL gets paid; and

Idea 3) Amendment of licenses does not affect how long NBL gets paid.

The separation of the event of the termination of the agency agreement from the duration of payments found in the original agreement is retained in the amendment.

## 1991 AMENDMENT ADDS CONDITION ON PAYMENT DURATION

Finally, comparing the plain language of the amendment with the original reveals that one new idea constituting an additional condition on the duration of payment was added in 1991.

Idea 4) Payments to NBL also cease when both Gene and Miriam Summ cease to be actively engaged in the business.

The new idea (4) is an additional condition on the duration of the payment obligation requiring that either Gene of Miriam Summ be "actively engaged in the business."

As amended, 5.3 provides that NBL gets paid pursuant to the right and in the amount established in Section 5.2 for as long as licenses are in effect <u>and</u> either Gene or Miriam Summ remains actively engaged in the business. If the licenses expire, payments to NBL stop. If and when both Gene and Miriam Summ stop being "actively engaged in the business," as that concept is specifically defined in the amendment, the

payments stop. Neither termination of the agency agreement nor substitution of licenses affects whether or for how long NBL gets paid. The plain language of the termination clause states that termination of the agreement has no effect on the payment obligation. No affect simply means just that – no affect. If "A" acts to eliminate "B," it certainly cannot be said that "A" has had no affect on "B". Rather, "A" had a profound affect on "B" by eliminating "B."

## V.
## NBL'S FAILURE TO CONTINUE NEW LICENSE SOLICITATION WITHOUT EXCUSE

Having admitted that it has not after termination of the agreement continued to "actively and regularly solicit new licensees for WD, NBL seeks to excuse its failure to do so on a number of grounds. First and foremost, of course, is the position that termination of the agency agreement eliminates this requirement. This issue has received extensive analysis both in this brief and in WD's Brief in Opposition to NBL's Motion for Partial Summary Judgment and will not be reproduced here.

High on NBL's excuse list is that it made one offer to attempt to replace a license that was not renewed but was advised by a former WD officer not to make such an attempt. (WD'S APPENDIX pg. 59-64). From the summary judgment proof it is clear that what NBL had in mind and proposed was an attempted replacement of an existing license which had expired rather than "active" and "regular" solicitation of **new** licenses. Recall that the only reason WD exercised its right to terminate the agency agreement was the desire to manage its licensing program in house. (WD'S APPENDIX pg. 30-31). Therefore, WD did not need NBL to replace existing licensees. Rather the condition for continued payments, *inter alia*, was active and regular solicitation of **new** licensees. It is undisputed that not one new licensee was ever actually solicited. It is also clear that

there was never any written or oral modification of the requirement that NBL continue active and regular new license solicitation. Gene Summ had to admit there was no statement made by WD, none even by the officer who declined NBL assistance to replace an existing license, that NBL no longer was required to actively and regularly solicit new licensees.

## VI.
## AMENDED SECTION 5.3 AUTHORIZES NBL TO SOLICIT LICENSES ON A NONEXCLUSIVE BASIS

NBL seeks to excuse its admitted failure to "actively and regularly solicit new licensees" for Dickies by claiming that termination of the agency agreement terminated its authority to do so. Section 3.1 of the original agreement provided as follows:

> "Licensor authorizes NBL to approach parties in the relevant geographic area, other than parties which Licensor may specifically exclude in written notice to NBL and to ascertain the potential interest of such parties in acquiring a license from Licensor for the Rights. (Appendix in Support of the Motion of National Brand Licensing, Inc. for Partial Summary Judgment pg 113-14)"

This section was, of course, not amended. NBL observes that termination of the agency agreement results in Section 3.1 being inoperative to grant it authority to solicit licenses. Needing an excuse for its lack of performance, NBL leaps to the conclusion that it is not authorized to solicit licenses for Dickies. NBL even goes further, in fact, to contend it is actually prohibited from soliciting new licensees for Dickies. NBL's attempt to avoid the consequences of its failure to actively and regularly solicit licenses for Dickies through the excuse of lack of authority is misplaced.

First, NBL's premise is that some specific authority to solicit licenses is required. NBL cites no legal requirement that it have any specific authority in order to simply contact prospective licensees and communicate with them to determine whether any

interest exists to attempt to agree on a license. Even under the terms of the original agency agreement, NBL had no authority to commit Dickies to any prospective license and WD had to approve and execute any and all licenses negotiated. WD is unaware of any legal or ethical prohibition preventing NBL from communicating with prospective licensees to solicit licenses. As NBL has cited no statute, code or case containing any legal prohibition, it appears that NBL's premise that some specific authority is required is hopelessly flawed.

Second, just as there is no legal requirement for special or actual authority, NBL has not cited any legal requirement that it must be vested with express as opposed to implied authority to be able to solicit licenses. Section 5.3 as amended defines being "actively engaged in the business," *inter alia*, to require NBL to actively and regularly solicit new licensees. Without question, by requiring that NBL actively and regularly solicit licenses, Dickies has by implication authorized NBL to comply with the requirement. Accordingly, NBL has implied authority to actively and regularly solicit licenses. Therefore NBL cannot then use lack of authority as an excuse for failing to have actively and regularly solicited licenses.

## VII.
## POST-TERMINATION PAYMENTS CONSISTENT WITH UNDERSTANDING OF THE AGREEMENT

NBL claims the fact that WD continued to pay NBL for a period of time after the agreement was not renewed is conduct that evidences Dickies understanding of the agreement which is inconsistent with its current position on how the language should be construed. NBL concludes Dickies continued to pay NBL because WD recognized that termination of the agency agreement eliminated the condition that the

Summs continue to be "actively engaged in the business". Review and analysis of the summary judgment proof and NBL's argument reveals that there is nothing about the conduct of Dickies inconsistent with either the plain language of the agreement or WD's position in this case. In fact WD's conduct is consistent with its understanding of the contract and its contentions in this case.

It is undisputed that the 1998 termination of the agreement was discretionary through non-renewal of its term. The letter from WD to NBL (Plaintiff's Exhibit 3 Appendix in Support of Motion of National Brand Licensing, Inc. for Partial Summary Judgment pg. 135-36) plainly stated that WD believed it was in its best interest to manage its future licensing efforts internally. Accordingly, NBL was given notice of WD's intent to terminate the agreement at the end of the current term. This is precisely the notice required in Section 8.1 of the agreement as amended. (Appendix in Support of Motion of National Brand Licensing, Inc. for Partial Summary Judgment pg. 133). Nowhere in the letter serving notice of the intent not to renew did Dickies claim both Gene and Miriam Summ had "ceased to be actively engaged in the business."

It is undisputed that WD did not claim both Gene and Miriam Summ "ceased to be actively engaged in the business" until January 30, 2002 (Plaintiff's Exhibit 6 Appendix in Support of Motion of National Brand Licensing, Inc. for Partial Summary Judgment pg. 142-44). Because WD understood that termination does not affect how much or for how long NBL gets paid, Dickies naturally continued payments to NBL after the agreement terminated by non-renewal. Therefore paying NBL after termination of the agency but before claiming Gene and Miriam Summ cannot raise a valid inference

that WD understood that termination of the agreement eliminated the condition that Summs continue "active engagement".

Had Dickies terminated the agreement contending that both Gene and Miriam Summ had "ceased to be actively engaged in the business" and then consistently paid NBL over a four-year period, perhaps an inference as to the inconsistency of its positions could be drawn. However, WD stopped payments only after giving NBL notice that it had concluded that both Summs had "ceased to be actively engaged in the business".

From review of the summary judgment proof above it is clear that NBL is simply mistaken in its conclusion that continuing payments after termination evidences that WD understood that the condition of "active engagement" had been eliminated. Dickies continued to make payments after the agreement terminated by non-renewal evidencing that WD understood that termination of the agreement does not affect how much or how long NBL gets paid. Further, the fact that cessation of payments to NBL was preceded by notice that Dickies concluded that both Summs had "ceased to be actively engaged" evidences that WD understood that termination of the agreement did not affect how long NBL gets paid. WD's conduct is fully consistent with the understanding it has always had of the plain language of the amendment, that termination of the agreement has no effect on the condition that either Gene or Miriam Summ must continue "active engagement in order for payments to continue.

## VIII.
## DECLARATION OF R. STEPHEN LEFLER INCONSISTENT WITH PRIOR STATEMENT

Williamson-Dickie continues to contend that evidence of the intent of the parties should be determined solely by the contract as written and amended. However, in the unlikely event that WD is in error in its analysis and the court is inclined to consider extrinsic evidence, Dickies would show that a memo prepared at the direction of R. Stephen Lefler on May 14, 1991 from Lefler's handwritten notes (WD'S APPENDIX Tab 2, p.5) clearly expresses WD's intent. The written expression of intent in the Lefler memo is clear and consistent with the terms of the 1991 amendment as actually executed by the parties.

Lefler's memo states in pertinent part:

> "Gene and Miriam Summ will be entitled to remuneration for License management services as long as they are active in the business Brand Licensing business." ( WD'S APPENDIX Tab 2, p. 5.)

Lefler's memo plainly states the same idea expressed in the 1991 amendment, that payments to NBL are conditioned on Summs' continued "active engagement". Obviously the Lefler memo provided the ideas behind the 1991 amendment despite NBL's protestations that Decker Jones law firm was the author. The "authorship" of the 1991 amendment closely follows the Lefler memo and it is clear that the drafting of the 1991 amendment executed on May 29, 1991 gives effect to the ideas expressed in the Lefler memo of May 14, 1991.

Nothing in the Lefler memo expresses any intent that "active in the Brand Licensing business" be eliminated by termination of the agency agreement. Clearly had Lefler wanted to limit the "active engagement" requirement to the duration of the agency

agreement he would have so stated in the memo and the 1991 amendment would have given effect to that idea. The only reasonable conclusion which can be drawn is that in 1991 Lefler intended to pay NBL only as long as the Summs remained "actively engaged".

Now that Lefler is an ex-president of WD, his current recollection of his 1991 intent as claimed in his 2003 declaration (Appendix to NBL's Motion for Partial Summary Judgment Tab E pgs. 247-272) is quite inconsistent with his 1991 memo. Lefler claims his intent in 1991 was that the "actively engaged" requirement would not survive the termination of the agency agreement. Lefler also purports to recall a quasi-legal analysis in 1991 concerning whether after termination of the agreement, NBL would be "authorized" to solicit new licensees, concluding that NBL would not be so authorized. Again nothing in Lefler's written memo states these ideas. No doubt the 1991 memo is the most authoritative evidence of Lefler's intent in 1991.

The Lefler memo together with the declarations of Lefler and Summ provide a good example of why the parole evidence rule exists. As time passes, positions and loyalty change, and recollections change, intent as expressed in evidence extrinsic to the written contract is simply not as reliable as expressed in the written agreement. Thus WD wants the record clear that it does not consider this a casein which parole evidence of any kind should be considered. WD submitted this evidence for consideration only in the event the court disagrees as considers evidence extraneous to the 1991 written contract. Whether or not the court elects to consider Lefler's evidence ,WD is still entitled to the partial summary judgment it seeks.

## PRAYER

WHEREFORE PREMISES CONSIDERED, William-Dickie Manufacturing Company prays that upon consideration hereof the court will grant WD's Motion for Partial Summary Judgment. WD prays the court will make a declaration construing the contract that payments to NBL ceased when both Gene and Miriam Summ ceased to be actively engaged in the business. WD prays the court will declare that no legal prohibition exists preventing National Brand Licensing, Inc. from actively and regularly soliciting new licensees. Dickies further prays for general and such other relief at law and in equity to which it may show itself justly entitled.

Respectfully submitted,

_____
Daniel L. Bates
State Bar No. 01899900

Decker, Jones, McMackin, McClane,
  Hall & Bates, P.C.
Burnett Plaza, Suite 2000
801 Cherry Street, Unit #46
Fort Worth, Texas  76102-6836
(817) 336-2400
(817) 332-3043 fax
ATTORNEY FOR DEFENDANT

## Certificate of Service

I HEREBY CERTIFY that this instrument was provided to:

Ernest F. Figari, Esq.
Dennis M. Lynch, Esq.
Figari Davenport & Graves
901 Main St., Suite 3400
Dallas, TX 75202

in accordance with the Federal Rules of Civil Procedure, on this 3rd day of February, 2003.

Daniel L. Bates