IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONAL BRAND LICENSING, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:02-CV-0663-A |
| | § | |
| WILLIAMSON-DICKIE MANUFACTURING COMPANY, A Texas Corporation, and WILLIAMSON-DICKIE MANUFACTURING COMPANY, A Delaware Corporation, | § § § § § § | |
| | § | |
| Defendants. | § | |

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.
IN SUPPORT OF ITS RESPONSE TO DEFENDANT'S
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Ernest E. Figari, Jr.
State Bar No. 06983000
Dennis M. Lynch
State Bar No. 90001506

FIGARI DAVENPORT & GRAVES, L.L.P.
3400 Bank of America Plaza
901 Main Street
Dallas, Texas 75202
(214) 939-2000
(214) 939-2090 (FAX)

ATTORNEYS FOR PLAINTIFF
NATIONAL BRAND LICENSING, INC.

## **TABLE OF CONTENTS**

**Page**

I. SUMMARY OF RESPONSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.      The Exclusive Agency Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      B.      1991 Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      C.      Documentation and Signing of 1991 Amendment. . . . . . . . . . . . . . . . . . . . 5
      D.      Termination of the Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      E.      The Ensuing Four Years. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      F.      Cessation of Payments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III. ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.      Williamson's Interpretation Is Not Supported By The Plain
            Language Of The Agreement In Light Of The Surrounding
            Circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            1. Plain Language of the 1991 Amendment. . . . . . . . . . . . . . . . . . . . . . . 9
            2. Surrounding Circumstances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      B.      Williamson's Current Interpretation Is Not Supported By The
            Interpretation Williamson Placed On The 1991 Amendment
            Before The Dispute Arose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      C.      Williamson's Interpretation Is Improper
            Because It Drafted The 1991 Amendment. . . . . . . . . . . . . . . . . . . . . . . . 24
      D.      Even If The Court Adopts Williamson's Interpretation, There Is
            A Fact Dispute As to Whether NBL's Performance Is Excused . . . . . . . . 25

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25



## TABLE OF AUTHORITIES

### STATE CASES

**Page**

*Allison v. National Union Fire Insurance Co.*, 734 S.W.2d 645 (Tex. 1987) ............................. 9

*Anchor Casualty Co. v. Robertson Transport Co.*, 389 S.W.2d 135
(Tex. Civ. App.--Corpus Christi 1965, writ ref'd n.r.e.) ................................................. 21

*Enell Corp. v. Longoria*, 834 S.W.2d 132
(Tex. App.--San Antonio 1992, writ denied) ................................................................. 24

*Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979) ........................................................ 9, 21, 24

*Kelley-Coppedge, Inc. v. Highlands Insur. Co.*, 980 S.W.2d 462 (Tex. 1998) ........................... 11

*Manzo v. Ford*, 731 S.W.2d 673 (Tex. App.--Houston [14th Dist.] 1987, no writ) .................... 24

*Portland Gasoline Co. v. Superior Marketing Co.*, 243 S.W.2d 823 (Tex. 1951) ...................... 16

*Temple-Eastex, Inc. v. Addison Bank*, 672 S.W.2d 793 (Tex. 1984) .......................................... 24

### OTHER

N.D. Tex. L.R. 56.6 .................................................................................................................... 3

Restatement (Second) of Contracts § 202(4) (1981) ................................................................ 21

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONAL BRAND LICENSING, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:02-CV-0663-A |
| | § | |
| WILLIAMSON-DICKIE MANUFACTURING COMPANY, A Texas Corporation, and WILLIAMSON-DICKIE MANUFACTURING COMPANY, a Delaware Corporation, | § § § § § § | |
| | § | |
| Defendants. | § | |

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC.
IN SUPPORT OF ITS RESPONSE TO DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff National Brand Licensing, Inc. ("NBL") files this Brief in Support of Its Response to Defendant's Motion for Partial Summary Judgment and, in this regard, would respectfully show the Court as follows:

**I. SUMMARY OF RESPONSE**

NBL and Defendant Williamson-Dickie Manufacturing Company ("Williamson") have both filed motions for partial summary judgment requesting the Court to construe a written agreement between the parties. The parties agree on at least two matters germane to the Court's decision. First, NBL agrees with Williamson that the written agreement at issue is clear, in plain language, and unambiguous. Second, NBL agrees that the primary issue in

this case is whether the "actively engaged" condition survived Williamson's termination of the Agreement.[1] Stated differently, whether after Williamson terminated the Agreement and thereby revoked NBL's authority to act on behalf of Williamson, Gene or Miriam Summ (the owners of NBL) were required to remain "actively engaged" as that term is defined in the Agreement. Not surprisingly, the parties have a fundamental disagreement as to the appropriate resolution of this issue and the proper interpretation of the Agreement. In its motion for partial summary judgment, Williamson argues that, even after termination, the Summs were required to remain "actively engaged" in order for NBL to continue receiving its 15% Interest in royalties from underlying licenses NBL procured for Williamson. As part of this "actively engaged" test, Williamson contends that the Summs were still required to solicit new licensees for Williamson.

NBL asserts that Williamson's construction of the agreement is incorrect. Based on the well-established rules of contract interpretation, including consideration of the plain language of the Agreement in light of the surrounding circumstances as well as Williamson's interpretation prior to this dispute, NBL submits that the "actively engaged" requirement <u>does not</u> survive termination of the Agreement as a matter of law. Nevertheless, to the extent the Court disagrees with NBL's interpretation, Williamson's motion for partial summary judgment must nevertheless be denied because there remains a fact dispute as to whether NBL's performance of the "actively engaged" requirement was excused.

---

[1] To the extent certain terms were defined in NBL's previous briefs, those same defined terms will be used throughout this Brief.

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC. IN SUPPORT OF
ITS RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT - Page 2**

## II. STATEMENT OF FACTS[2]

A. **The Exclusive Agency Agreement.** Prior to 1980, Williamson did not license its trademarks and trade names to third parties (60-62, 64). In the middle of 1980, Gene Summ, on behalf of NBL, approached Williamson in an attempt to interest it in a Licensing Program whereby Williamson, through the assistance of NBL (a company whose business is soliciting, negotiating, structuring, and marketing licenses of intellectual property), would offer a license of its trademarks and trade names to third parties (207-208). As a result of this contact, the parties entered into the Agreement (111-123).

The Agreement provides that during its term, NBL "shall be the sole and exclusive" agent of Williamson for purposes of procuring licensees for Williamson (120). As regards the authority of NBL, the agreement states that "NBL <u>is hereby authorized</u> to offer for license" to third parties those rights of Williamson specified in the Agreement (113). As compensation for its services, the Agreement provides, among other things, that Williamson

---

[2] In connection with its own motion for partial summary judgment and pursuant to N.D. Tex. L.R. 56.6, NBL filed its Appendix in Support of the Motion of Plaintiff National Brand Licensing, Inc. for Partial Summary Judgment. Because NBL relies almost exclusively on the contents of its previously filed Appendix in responding to Williamson's motion, and to avoid redundancy, NBL has not refiled an identical appendix in connection with this response. Instead, as it did in its principal brief in support of its motion, reference throughout this response is made to the relevant pages of the original Appendix where the materials are found (<u>e.g.</u>, "1").

In addition to the contents of its original Appendix, NBL has submitted a second declaration from Gene Summ and additional excerpts from Mr. Williamson's deposition to specifically address an issue of fact raised in Williamson's motion. These items are included in the Appendix (Second) in Support of the Response of Plaintiff National Brand Licensing, Inc. to Defendant's Motion for Partial Summary Judgment. For consistency, NBL has continued the numbering of this supplemental appendix with the last number of the original Appendix and will reference the contents of the second appendix in the same way the relevant pages of the original Appendix are referenced.

Unless otherwise indicated, all emphases are supplied by counsel.

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC. IN SUPPORT OF
ITS RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT - Page 3**

will pay NBL the 15% Interest (116). The business relationship between NBL and Williamson proved successful[3] and, as a result, over the next several years, the parties expanded the scope of the products and geographic area to which the Agreement pertained (22-25, 63-64, 208, 227-232).

**B.     1991 Amendment.** In the early part of 1991, R. Stephen Lefler, who at the time was the president and chief executive officer of Williamson and oversaw its Licensing Program, arranged a meeting in New York with Gene Summ, the president of NBL (209, 249). According to Mr. Lefler, he wished to insure that neither NBL nor the Summs would thereafter transfer the 15% Interest provided in the Agreement (249-250). When Mr. Lefler and Mr. Summ met, Mr. Lefler suggested that the Agreement be amended so as to foreclose any future assignment of the 15% Interest (209).

After receiving Mr. Lefler's proposal, Mr. Summ discussed the matter with Miriam Summ, his wife and business partner (209). They decided that NBL would agree to the proposal if the exclusivity period under the Agreement (i.e., the period during which neither party could terminate the Agreement for convenience) was extended by five years (209). When NBL's request was subsequently presented to Mr. Lefler, he agreed to it on behalf of Williamson, provided Miriam or Gene Summ remained active in the Licensing Business during the term of the Agreement (209, 250). Mr. Lefler stated that his purpose in imposing this condition was to make sure that, if Williamson granted a five-year extension of the

---

[3] Philip C. Williamson, the current president of Williamson, testified that revenues from licenses procured by NBL had reached approximately $32 million by 1997 (62-63).

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC. IN SUPPORT OF
ITS RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT - Page 4**

period of exclusivity, the Summs would continue to dedicate themselves to the Licensing Program and not rest on their past successes (250). On behalf of NBL, Mr. Summ agreed to this condition (209, 250).

In agreeing to amend the Agreement in the respects discussed, it was Mr. Lefler's understanding and intent on behalf of Williamson (1) that, should Gene Summ and his wife cease to be "actively engaged" in the Licensing Business during the term of the Agreement, Williamson would no longer be obliged to pay the 15% Interest to NBL, (2) but if either Williamson or NBL elected to terminate the Agreement after the five-year exclusive period for the convenience of either party, the obligation of Williamson to pay the 15% Interest would continue beyond such termination (250-251). Of course, Mr. Summ and Mr. Lefler share the same view as to what this amendment was intended to accomplish (209-210).

C. **Documentation and Signing of 1991 Amendment.** After Mr. Lefler and Mr. Summ agreed on the terms of the proposed amendment, Mr. Lefler requested that the Decker law firm prepare and draft the document incorporating the agreement (31-33, 50, 210, 251).[4] After Mr. Summ received the proposed amendment from Williamson's attorneys, it was signed by NBL, Gene Summ and Miriam Summ (134, 210, 251).[5] The 1991 Amendment is dated May 29, 1991 (130-134).

---

[4] Williamson's attorneys were not involved in the negotiations and, in drafting the proposed amendment, merely acted on what Mr. Lefler told them (251).

[5] Neither NBL, Gene Summ, nor Miriam Summ had any attorney representing their interests review or advise them with respect to the 1991 Amendment before they signed it (210).

BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC. IN SUPPORT OF
ITS RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT - Page 5

D.   **Termination of the Agreement.**  After Mr. Lefler left Williamson in 1996 and Philip C. Williamson assumed his position, Mr. Williamson unilaterally decided to terminate Williamson's 18 year business relationship with NBL (17).  To this end, Mr. Williamson sent the Termination Letter, dated February 26, 1998, to NBL stating that Williamson was terminating the Agreement for the convenience of Williamson, effective May 31, 1998 (53-54, 135-136, 210).[6]

By letter dated March 9, 1998, and on behalf of NBL, Mr. Summ responded to the Termination Letter (137-140, 240-243).  In his response, Mr. Summ expressed his disappointment and, with respect to the payment of the 15% Interest and NBL's future role in the Licensing Program, observed:

> I'm sure you are aware that our Agreement provides that your obligation to pay NBL its 15% interest in the proceeds you derive from licenses in place continues.
>
> * * *
>
> Upon request, you may be assured of our cooperation in the event you wish us to advise and consult with you on any matter having to do with [Williamson] licensing.

(138, 241).  It is undisputed that no one from Williamson responded to Mr. Summ's letter (80-81).

---

[6] It is undisputed that Williamson had never in the past experienced any problems with NBL (69).  Indeed, in the Termination Letter, Mr. Williamson extolled the successes of NBL, allowing as how the efforts of NBL had "contributed significantly" to the development of the Licensing Program (135, see 63-64).  The vice president of licensing at Williamson was in agreement with this view (171).

**BRIEF OF PLAINTIFF NATIONAL BRAND LICENSING, INC. IN SUPPORT OF
ITS RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT - Page 6**